**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **WILLIAM LORUSSO, MARGARET GURLIDES, LINDA MORIARTY, RICHARD SEABERG, GARY LEONARD, CAROL VORPERIAN, NICHOLAS CAMPAGNOLA, JEROLD SCHERER, DENISE BEVILACQUA,** AND **KAREN CERVANTES,** *on behalf of themselves and all others similarly situated,*<br><br>*Plaintiffs,*<br><br>v.<br><br>**NORTHWELL HEALTH PENSION PLAN, NORTH SHORE UNIVERSITY HOSPITAL, NORTHWELL HEALTH, INC.,** AND **PENSION COMMITTEE,**<br><br>*Defendants.* | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**Civil Action No.**<br><br>**2:24-cv-02785** |

## CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of all other similarly situated participants and beneficiaries, by and through their counsel, Thomas and Solomon PLLC, bring this class action complaint against Northwell Health Pension Plan f/k/a Northwell Health Cash Balance Plan f/k/a North Shore-Long Island Jewish Health System Cash Balance Plan f/k/a North Shore University Hospital Pension Plan; North Shore University Hospital; Northwell Health, Inc.; and Pension Committee[1] (collectively "Defendants"), and allege as follows:

## NATURE OF ACTION

1.      This is a class action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*

---

[1]      The "Pension Committee" includes all iterations of the term Pension Committee, as defined by the Northwell Health Pension Plan, including, but not limited to, the Insurance and Pension Committee.

## JURISDICTION AND VENUE

2.        The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a).

3.        Venue here is proper inasmuch as this District is where the Defendant Northwell Health Pension Plan f/k/a Northwell Health Cash Balance Plan f/k/a North Shore-Long Island Jewish Health System Cash Balance Plan f/k/a North Shore University Hospital Pension Plan  is administered, where some or all of the alleged breaches took place, where all Defendants may be found, and where many known Defendants reside. *See* 29 U.S.C. § 1132(e).

## THE PARTIES

### *Defendants*

4.        Defendant Northwell Health Pension Plan f/k/a Northwell Health Cash Balance Plan f/k/a North Shore-Long Island Jewish Health System Cash Balance Plan f/k/a North Shore University Hospital Pension Plan (the "Plan") is and was at all relevant times an "employee pension benefit plan," and more specifically a "defined benefit plan," within the meaning of 29 U.S.C. §§ 1002(2)(A) and 1002(35).

5.        Defendant North Shore University Hospital ("NSUH") was the Sponsor, Plan Administrator, and named fiduciary of the Plan within the meaning of 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a), during the class period until on or about December 31, 2017, and is sued in each of these capacities.

6.        Defendant Northwell Health, Inc. ("Northwell"), is a not-for-profit corporation registered under the laws of New York, with its headquarters and principal place of business located in Nassau County, New York. Northwell is New York's largest private employer and

health care provider, with approximately 21 hospitals and about 900 outpatient facilities, serving the New York City, Long Island, and Westchester areas.

7.      Since on or about January 1, 2018, Defendant Northwell has been the Sponsor, Plan Administrator, and a named fiduciary of the Plan, within the meaning of 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a), and is sued in each of these capacities.

8.      Defendant Pension Committee ("Committee") is a named fiduciary of the Plan, within the meaning of 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a), and is sued in each of these capacities.

9.      A reference to one Defendant should be construed as a reference to the other Defendants, and applies equally to the Defendants' predecessors, successors, subsidiaries or affiliates, participating employers, current and former directors, officers, employees, agents, attorneys, fiduciaries and/or service providers.

***Named Plaintiffs***

10.     Named Plaintiff William Lorusso was employed in various positions, including Physician Assistant and Senior Physician Assistant at one or more of the Plan's adopting employers, or their predecessors, for approximately 36 years, from 1988 through 2024.

11.     At all relevant times during his employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff William Lorusso participated in one of the Plan's predecessor Legacy Plans.[2]

12.     Named Plaintiff William Lorusso was, and is a participant in the Plan, within the

---

[2]      "Legacy Plans" include the NSUH Pension Plan; Central General Legacy Plan; Glen Cove Legacy Plan; Forest Hills Legacy Plan; and/or Syosset Legacy Plan.

meaning of 29 U.S.C. § 1002(7), because he has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

13.    Named Plaintiff William Lorusso was a participant in the Plan on January 1, 1999, and accrued additional benefits after January 1, 1999, pursuant to the Cash Balance Provisions[3] of the Plan.

14.    Named Plaintiff Margaret Gurlides was employed in various positions, including Dietary Aid, Supervisor of Food Service, Production Manager, Assistant Director of Food and Nutrition, and Senior Manager of Food and Nutrition at one or more of the Plan's adopting employers, or their predecessors, for approximately 43 years, from 1980 through 2023.

15.    At all relevant times during her employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Margaret Gurlides participated in one of the Plan's predecessor Legacy Plans.

16.    Named Plaintiff Margaret Gurlides was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because she has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

17.    Named Plaintiff Margaret Gurlides was a participant in the Plan on January 1, 1999, and accrued additional benefits after January 1, 1999, pursuant to the Cash Balance Provisions of the Plan.

18.    Named Plaintiff Linda Moriarty was employed as a Registered Nurse at one or more of the Plan's adopting employers, or their predecessors, for approximately 28 years, from

---

[3]    "Cash Balance Provisions" refers to the provisions in the Plan introduced effective January 1, 1999, where pay credits were and are credited at the end of the first pay period in March, June, September and December, then, again on December 31, according to a schedule set forth in the Plan document.

1992 through 2020.

19.     At all relevant times during her employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Linda Moriarty participated in one of the Plan's predecessor Legacy Plans.

20.     Named Plaintiff Linda Moriarty was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because she has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

21.     Named Plaintiff Linda Moriarty was a participant in the Plan on January 1, 1999, and accrued additional benefits after January 1, 1999, pursuant to the Cash Balance Provisions of the Plan.

22.     Named Plaintiff Richard Seaberg was employed in various positions, including Medical Technologist, Lab Supervisor, Lab Section Manager, Project Coordinator, Assistant Administrative Director of Laboratories, Administrative Director of Laboratories, Senior Administrative Director of Laboratory Medicine, Director of Business Services for Laboratory Medicine, and Director of Business Services/Senior Administrative Director at one or more the Plan's adopting employers, or their predecessors, for approximately 45 years, from 1978 through February 2021, and then from April 2021 through February 2024.

23.     At all relevant times during his employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Richard Seaberg participated in one of the Plan's predecessor Legacy Plans.

24.     Named Plaintiff Richard Seaberg was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because he has a claim to vested benefits under the explicit terms

of the Plan, as well as an entitlement to Plan benefits as required by law.

25.      Named Plaintiff Richard Seaberg was a participant in the Plan on January 1, 1999, and accrued additional benefits after January 1, 1999, pursuant to the Cash Balance Provisions of the Plan.

26.      Named Plaintiff Gary Leonard  was employed as a Biller,  Assistant Director of Purchasing, Director of Purchasing, and Vice President of Purchasing at one or more of the Plan's adopting employers, or their predecessors, for approximately 33 years, from 1974 through 2007.

27.      At all relevant times during his employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Gary Leonard participated in one of the Plan's predecessor Legacy Plans.

28.      Named Plaintiff Gary Leonard was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because he has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

29.      Named Plaintiff Gary Leonard was a participant in the Plan on January 1, 1999, and accrued additional benefits after January 1, 1999, pursuant to the Cash Balance Provisions of the Plan.

30.      Named Plaintiff Carol Vorperian was employed in various positions, including Assistant Director of Nutrition and Food Service and Director of Nutrition and Food Service at one or more of the Plan's adopting employers, or their predecessors, for approximately 23 years, from 1990 through 2013.

31.      At all relevant times during her employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Carol Vorperian

participated in one of the Plan's predecessor Legacy Plans.

32.     Named Plaintiff Carol Vorperian was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because she has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

33.     Named Plaintiff Carol Vorperian was a participant in the Plan on January 1, 1999, and accrued additional benefits after January 1, 1999, pursuant to the Cash Balance Provisions of the Plan.

34.     Named Plaintiff Nicholas Campagnola was employed as a Physical Therapist, Physical Therapist Supervisor, and Physical Therapist Manager at one or more of the Plan's adopting employers, or their predecessors, for approximately 39 years, from 1978 through 2017.

35.     At all relevant times during his employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Nicholas Campagnola participated in one of the Plan's predecessor Legacy Plans.

36.     Named Plaintiff Nicholas Campagnola was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because he has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

37.     Named Plaintiff Nicholas Campagnola was a participant in the Plan on January 1, 1999, and accrued additional benefits after January 1, 1999, pursuant to the Cash Balance Provisions of the Plan.

38.     Named Plaintiff Jerold Scherer was employed in various positions, including Mechanic, Electrician, Assistant Director of Engineering, Director of Engineering and Safety, Director of Facilities, Senior Administrative Director of Facilities, and Associate Executive

Director, Support Services at one or more of the Plan's adopting employers, or their predecessors, for approximately 40 years, from 1981 through 2021.

39.     At all relevant times during his employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Jerold Scherer participated in one of the Plan's predecessor Legacy Plans.

40.     Named Plaintiff Jerold Scherer was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because he has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

41.     Named Plaintiff Jerold Scherer was a participant in the Plan on January 1, 1999, and accrued additional benefits after January 1, 1999, pursuant to the Cash Balance Provisions of the Plan.

42.     Named Plaintiff Denise Bevilacqua was employed in various positions, including Registered Dietician, Operations Analyst, and Senior Patient and Customer Experience Specialist at one or more of the Plan's adopting employers, or their predecessors, for approximately 27 years, from 1988 through 2006, and then from 2013 through 2022.

43.     At all relevant times during her employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Denise Bevilacqua participated in one of the Plan's predecessor Legacy Plans.

44.     Named Plaintiff Denise Bevilacqua was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because she has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

45.     Named Plaintiff Denise Bevilacqua was a participant in the Plan on January 1, 1999,

and accrued additional benefits after January 1, 1999, pursuant to the Cash Balance Provisions of the Plan.

46.     Named Plaintiff Karen Cervantes was employed in various positions, including Clerk Typist, Associate Administrative Support, and Medical Secretary at one or more of the Plan's adopting employers, or their predecessors, for approximately 28 years, from 1995 through 2023.

47.     At all relevant times during her employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Karen Cervantes participated in one of the Plan's predecessor Legacy Plans.

48.     Named Plaintiff Karen Cervantes was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because she has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

49.     Named Plaintiff Karen Cervantes was a participant in the Plan on January 1, 1999, and accrued additional benefits after January 1, 1999, pursuant to the Cash Balance Provisions of the Plan.

## STATEMENT OF FACTS

### *Relevant Employer and Plan History*

50.     North Shore Hospital opened in 1953.

51.     North Shore Hospital was transformed into a teaching hospital when it joined with Cornell University in 1969, and its name was changed to North Shore University Hospital.

52.     Defendant NSUH adopted the Pension Plan for Employees of North Shore University Hospital ("Pension Plan of NSUH") effective as of January 1, 1966.

53.     In the 1990s, NSUH began to acquire and merge with financially troubled hospitals in the Long Island area. The first hospital to be acquired by NSUH was the Community Hospital at Glen Cove in 1990. Together the two hospitals formed the North Shore Regional Health Services Corporation, which was soon thereafter renamed the North Shore Health System ("NSHS").

54.     Effective as of January 1, 1993, the Retirement Plan for Employees of North Shore University Hospital at Glen Cove ("Glen Cove Legacy Plan") was merged into the Pension Plan of NSUH and the Pension Plan of NSUH became known as the Pension Plan for Employees of North Shore University Hospital/Past Service Plan for Employees of North Shore University Hospital at Glen Cove ("Pension Plan for Employees of NSUH/Past Service Plan for Employees of NSUH at Glen Cove").

55.     Among other things, the merger meant that:

a.  If an individual was a participant in the Glen Cove Legacy Plan on December 31, 1990, they automatically became a participant in the Pension Plan of NSUH on January 1, 1991.

b.  The Pension Plan of NSUH now stood in the same position legally as the Glen Cove Legacy Plan.

c.  The Pension Plan of NSUH took on the assets and liabilities (including both the payment liabilities and the legal liabilities) of the Glen Cove Legacy Plan.

56.     In 1994, Central General Hospital was renamed Plainview Hospital and joined the NSHS..

57.     Effective as of December 31, 1995, the Central General Hospital Retirement Income Plan ("Central General Legacy Plan") was merged into the Pension Plan for Employees of NSUH/Past Service Plan for Employees of NSUH at Glen Cove and the Pension Plan for

Employees of NSUH/Past Service Plan for Employees of NSUH at Glen Cove became known as the North Shore University Hospital Pension Plan ("NSUH Pension Plan").

58.    Among other things, the merger meant that:

a.    If an individual was a participant in the Central General Legacy Plan on January 1, 1995, and had completed a year of eligibility service as of that date, they automatically became a participant in the NSUH Pension Plan on January 1, 1995.

b.    The NSUH Pension Plan now stood in the same position legally as the Central General Legacy Plan.

c.    The NSUH Pension Plan took on the assets and liabilities (including both the payment liabilities and the legal liabilities) of the Central General Legacy Plan.

59.    In 1995, Syosset Hospital joined the NSHS.

60.    Also in 1995, LaGuardia Hospital was acquired by the NSHS and was renamed Forest Hills Hospital.

61.    Effective October 1997, the NSHS merged with the Long Island Jewish Medical Center ("LIJMC") and became known as the North Shore-Long Island Jewish Health System ("NS-LIJHS").

62.    Effective as of November 1, 1998, the North Shore University Hospital at Forest Hills Pension Plan ("Forest Hills Legacy Plan") and the North Shore University Hospital at Syosset Pension Plan ("Syosset Legacy Plan") were merged into the NSUH Pension Plan.

63.    Effective as of January 1, 1999, the NSUH Pension Plan was amended and restated to reflect the merger of the NSHS with the LIJMC and was also converted to a cash balance defined benefit plan ("Cash Balance Plan"), with the NSUH Pension Plan becoming known as the North Shore-Long Island Jewish Health System Cash Balance Plan ("NS-LIJHS Cash Balance Plan").

64.    Effective in 2016, the NS-LIJHS was rebranded and changed its name to

Northwell Health, Inc.

65.    Effective as of January 1, 2016, the NS-LIJHS Cash Balance Plan was renamed the Northwell Health Cash Balance Plan.

66.    Effective as of midnight on December 31, 2017, the sponsorship of the Northwell Health Cash Balance Plan was transferred from NSUH to Northwell Health, Inc.

67.    Effective at the close of business on December 30, 2022, the Northwell Health Cash Balance Plan was renamed the Northwell Health Pension Plan.

***The Traditional Benefit Formula***

68.    Prior to the Conversion Date of January 1, 1999 (the "Conversion Date" or "Date of Conversion"), Named Plaintiffs and Class Members participated in one or more of the Legacy Plans: NSUH Pension Plan; Central General Legacy Plan; Glen Cove Legacy Plan; Forest Hills Legacy Plan; or Syosset Legacy Plan.

69.    Prior to January 1, 1999, each Named Plaintiff (and other members of the Class) accrued benefits under one or more of the Legacy Plans' traditional defined benefit formulas, which determined Plan benefits according to formulas which included using an employee's compensation and service in the determination of the Plan benefit.

70.    For example, the NSUH Pension Plan generally provided for a monthly pension benefit, commencing at normal retirement age (age 65), equal to sum of:

(1)  for years in which an individual has 30 or less years of credited service:

(A) for years of credited service before 1/1/76:

(i) 1 ½% of basic compensation for 1975 (up to $14,100), plus

(ii) 2% of excess compensation for 1975, times

(iii) years of credited service before 1976; plus

(B) for each years of credited service between 1/1/76 and 12/31/88:

(i) 1 ½% of that year's basic compensation, plus

(ii) 2% of that year's excess compensation; plus

(C) for each year of credited service after 12/31/88:

(i) 1 ½% of that year's basic compensation up to the lesser of: (a) 150% of Social Security covered compensation or (b) the Social Security taxable wage base, plus

(ii) 2% of that's year's compensation in excess of the lesser of: (a) 150% of your Social Security covered compensation, or (b) the Social Security taxable wage base; and

(2) for individuals that have between 31 and 40 years of credited service: 1 ½% of that year's basic compensation for each year of credited service between 31 and 40 years of credited service ("Legacy Formula").

71.    For illustration, as explained to participants in a Summary Plan Description:

1. **The following calculation applies for your first 30 Years of Credited Service:**

   (A) For Years of Credited Service Before January 1, 1976

   (i)  1-1/2% of Basic Compensation for 1975 (up to $14,100) *plus*

   (ii)  2% of Excess Compensation for 1975 *times*

   (iii)  Years of Credited Service before 1976

   (B) For Years of Credited Service Between January 1, 1976 and December 31, 1988

   (i)  1-1/2% of Basic Compensation *plus*

   (ii)  2% of Excess Compensation

   (C) For Years of Credited Service Between January 1, 1988 and December 31, 1998

   (i)  1-1/2% of Basic Compensation up to the lesser of:

      (a)  150% of your Social Security Covered Compensation, or

      (b)  the Social Security Taxable Wage Base *plus*

   (ii)  2% of Compensation in excess of the lesser of:

      (a)  150% of your Social Security Covered Compensation, or

      (b)  the Social Security Taxable Wage Base.

   PLUS

2. **The following calculation applies to your 31st through your 40th Year of Credited Service:**

   1-1/2% of Basic Compensation for each Year of Credited Service between 31 and 40 Years of Credited Service.

For Credited Service
Before 1/1/76

Basic Compensation in 1975
$14,100 x 1 ½% = $212 x 6 years = $1,272

Excess Compensation in 1975
$3,900 x 2% = $78 x 6 years =          $   468
                                       $1,740

### PLUS

For Credited Service
between 1/1/76 and 12/31/98

| Year | Total Comp. | Basic Comp. | Excess Comp. | 1-1/2% of Basic Comp. | 2% of Excess Comp. | Total |
|------|-------------|-------------|--------------|-----------------------|--------------------|-------|
| 1976 | $19,000 | $15,300 | $ 3,700 | $ 230 | $74 | $304 |
| 1977 | 20,000 | 16,500 | 3,500 | 248 | 70 | 318 |
| 1978 | 21,000 | 17,700 | 3,300 | 266 | 66 | 332 |
| 1979 | 22,000 | 22,000 | 0 | 330 | 0 | 330 |
| 1980 | 23,000 | 23,000 | 0 | 345 | 0 | 345 |
| 1981 | 24,000 | 24,000 | 0 | 360 | 0 | 360 |
| 1982 | 25,000 | 25,000 | 0 | 375 | 0 | 375 |
| 1983 | 26,000 | 26,000 | 0 | 390 | 0 | 390 |
| 1984 | 27,000 | 27,000 | 0 | 405 | 0 | 405 |
| 1985 | 28,000 | 28,000 | 0 | 420 | 0 | 420 |
| 1986 | 29,000 | 29,000 | 0 | 435 | 0 | 435 |
| 1987 | 30,000 | 30,000 | 0 | 450 | 0 | 450 |
| 1988 | 31,000 | 31,000 | 0 | 465 | 0 | 465 |
| 1989 | 32,000 | 32,000* | 0 | 480 | 0 | 480 |
| 1990 | 33,000 | 33,000* | 0 | 495 | 0 | 495 |
| 1991 | 34,000 | 34,000* | 0 | 510 | 0 | 510 |
| 1992 | 35,000 | 35,000* | 0 | 525 | 0 | 525 |
| 1993 | 36,000 | 36,000* | 0 | 540 | 0 | 540 |
| 1994 | 37,000 | 37,000* | 0 | 555 | 0 | 555 |
| 1995 | 38,000 | 38,000* | 0 | 570 | 0 | 570 |
| 1996 | 39,000 | 39,000* | 0 | 585 | 0 | 585 |

* Beginning in 1989, Basic Compensation is limited to the lesser of (1) 150% of the Social Security Covered Compensation or (2) the Social Security Taxable Wage Base.

| Year | Total Comp. | Basic Comp. | Excess Comp. | 1-1/2% of Basic Comp. | 2% of Excess Comp. | Total |
|------|-------------|-------------|--------------|-----------------------|--------------------|-------|
| 1997 | 40,000 | 40,000* | 0 | 600 | 0 | 600 |
| 1998 | 41,000 | 41,000* | 0 | 615 | 0 | 615 |
| TOTAL | | | | $10,194 | $210 | $10,404 |

12/31/98 Accrued Benefit = $  1,740    (For service before 1/1/76)
                             10,404    (For service between 1/1/76 and 12/31/98)
                            $12,144    per year

1/12 x $12,144 = $1,012 per month

72.     The NSUH Pension Plan generally further provided that a participant could elect

to have their benefit commence prior to age 65 if they were at least age 55 with at least 10 years of

credited service.  Further, if the participant had at least 25 years of credited service and was either at least age 62 or their combined total of complete years of age and years of service was at least 80, then the benefit was not reduced for payment prior to age 65.  Otherwise, the benefit was reduced by 1/15th for each of the first 5 years, and 1/30th for each of the next 5 years that the benefit commencement date preceded age 65.

***January 1, 1999 Amendment and Restatement of the Plan to Constitute a Cash Balance Defined Benefit Plan***

73.    As discussed above, the NSHS merged with the LIJMC and became known as the NS-LIJHS.

74.    Within three years following the merger, the combined NS-LIJHS had an annual budget of $2.8 billion, 30,000 employees, 700 staff physicians, 7,000 attending physicians and 5,671 beds, making them at the time, the eighth-largest not-for-profit health-care system in the country.

75.    The NS-LIJHS lost nearly $50 million in 1998 and $17 million in 1999.

76.    One way the NS-LIJHS could save a substantial amount of money was by reducing the amount of money it contributed to its pension plan, a decision it had the unilateral right to make for its non-unionized workforce.

77.    Since the amount of money required to be contributed to a pension plan (interest adjusted over time) is tied directly to the amount of benefits paid, NS-LIJHS could lower pension plan costs by lowering benefits.  In fact, the only long-term way to lower pension costs is to lower pension benefits.  To say that differently, the sum of the contributions to the plan must equal the sum of the benefits paid, reduced by the interest earned on the funds in the pension trust, because there is no other source of funds to pay the benefits, meaning higher benefits require higher

contributions and lower benefits require lower contributions.

78.     One way to cut pension benefits that was used in the 1980-90s, without getting push back about a benefit cut from employees, was to hide the cut in benefits in a conversion from a more traditional pension plan to a cash balance plan.

79.     As discussed below, based on multiple factors, this could result in cost savings to the employer, over time, in the range of 20%-30%, and in some cases much more.

80.     The "savings" made by the employer, however, corresponded directly to "losses" in benefits in the same amount (adjusted by the actual return on investments) by the employees. Unless an employer is looking out for his employees' best interest, which it is not required while functioning under its settlor capacity, it has no incentive to tell the employees how much benefit they are losing because of the conversion to the cash balance plan.

81.     To the contrary, the employer's interest is to make the change sound as beneficial as possible so as to avoid employee resentment as a result of the plan change.

82.     One of ERISA's core functions is to require that those involved in administering an employer's retirement plans (*i.e.*, acting in a fiduciary capacity) to look out for the best interests of the plan participants, including keeping the participants advised about the impact of any significant changes in the plan.

83.     That legal fiduciary duty, though, is often in tension with the employer's interest, including as a settlor.

84.     For example, as described above, the employer who would want to cut its benefits and contributions, would whenever possible, keep the employees in the dark about their lost benefits.

85.     This case illustrates the decision Defendants made when confronted with the legal requirement of transparency and their own strong self-interest to hide the fact it was making substantial cuts to employees' benefits.

86.     As described below, Defendants ultimately chose secrecy and self-interest over transparency and the law, misleading participants so as to keep the potential adverse impact hidden.

87.     Here, for those individuals that were active participants in the NSUH Pension Plan as of December 31, 1998, with an accrued benefit under the NSUH Pension Plan that were still active participants as of January 1, 1999, Defendants used an "opening account balance" conversion method which froze accruals as of January 1, 1999, and then opened new hypothetical or notional account balance accounts with a beginning balance for each participant in an amount that allegedly "was determined by converting" the participant's "December 31, 1998 accrued benefit under the NSUH Pension Plan benefit formula to its present value on January 1, 1999." An employee communication describing the "Special Provisions Affecting Former Participants of the NSUH Pension Plan" is attached hereto as **Exhibit A**.

88.     It was (mis)represented to participants by Defendants that "[t]his conversion method assures that you receive a starting **value** in the [NS-LIJHS] Cash Balance Plan which is 'actuarially equivalent' to the **value** of the benefit you had accrued under the North Shore Pension Plan's benefit formula assuming that you retire at age 65." **Exhibit A** (emphasis added).

89.     Under the [NS-LIJHS] Cash Balance Plan, in the various Cash Balance Provisions, pay credits were and are credited at the end of the first pay period in March, June, September and December, then, again on December 31, according to a schedule set forth in the Plan document.

90.     Interest is and was credited at the end of the first pay period in March, June, September and December, then, again on December 31, to the participant's cash balance account based on the ending balance of the previous period. The interest crediting rate is based on the average yields of thirty-year U.S. Treasury Bonds during the months of September, October and November of the prior Plan year.

***The Wear-Away Effect, i.e., No Increase in Benefit for a Period of Time***

91.     In calculating each participant's opening account balance under the [NS-LIHS] Cash Balance Plan, Defendants undervalued the "value" of each participant's accrued benefit, as of December 31, 1998, by:

   a.   Ignoring the value, for those participants who could eventually have 25 years of service prior to age 65, of their right to retire prior to age 65 and receive an unreduced early retirement benefit (*i.e.* generally participants hired prior to age 40, without regard to their age on December 31, 1998);

   b.   Using an interest rate of 6.00% to discount the value of the accrued benefit at normal retirement age to present value, when the actual interest crediting rate might be, and in fact was, on average, less than 6.00%; and

   c.   Using a mortality discount that further reduced opening account balances to reflect the probability that a participant could die before reaching age 65.

92.     The result was that participants' cash balance account opening balances were in amounts significantly lower than the amounts required to provide the participants the benefits that each had already accrued under the Legacy Plans at their normal or early retirement age – so that in a very real sense, the participants started their participation under the Cash Balance Provisions of the Plan in a hole.

93.     Because participants started in a hole, participants subject to the Cash Balance Provisions in the Plan and who had previously accrued a benefit under the Legacy Plans

experienced a rate of benefit accrual of *zero* for varying periods of time until the balances of their cash balance accounts caught up with the already earned value of their frozen (*i.e.,* previously accrued and protected)[4] benefit payable at normal or early retirement age.

94.    This phenomenon, known as "wear-away," refers to any period of time where a plan participant appears to be accruing additional pension benefits, but is really just re-earning the value of the pension benefits that she or he had previously accrued under the prior plan.

95.    When Congress learned that retirement plans were drafting provisions that resulted in periods of "wear-away" of participants' benefits—provisions like those used by Defendants—it outlawed the practice altogether in 2006. *See* 29 U.S.C. § 1054(b)(5)(B)(iii).

96.    Wear-away is not an accident, but rather – until it was outlawed – it was an integral and cost-savings mechanism deliberately built into many cash balance plan conversions.

97.    It is not until after participants "wear-away" their already-accrued frozen Legacy Plan benefits, that these participants would experience a positive pension benefit accrual rate.

98.    That is precisely what occurred here to Named Plaintiffs and the members of the proposed Class and can be demonstrated by reference to the hypothetical individual, Joan, referenced in **Exhibit A.**

99.    Per **Exhibit A**, "Joan was a participant in the NSUH Pension Plan with an annual accrued benefit, payable at age 65, of $12,144 determined as of December 31, 1998 . . . . She is age 48 as of January 1, 1999.  Her Opening Account Balance was calculated as follows:

Annual accrued benefit x present value conversion factor = Opening Account Balance.

Age 48 lump sum conversion factor = 3.6163.

---

[4]    Under 29 U.S.C. § 1054(g), benefits cannot decline due to a plan amendment below the already earned benefit.

> $12,144 x 3.6163 = $43,916 (which represents the present value of Joan's benefit accrued to date assuming she starts to collect benefits at age 65)."

100.     The 3.6163 conversion factor was determined as the product of an age 65 factor (determined using 6.00% interest and mortality using the applicable mortality table) of 10.64635, the probability of survival from age 48 to age 65 (determined using the applicable mortality table) of 0.91467 and a discount for interest at 6.00% from age 65 to age 48 (*i.e.* $1/1.06^{(65-48)}$) of 0.37136.

101.     Thus, if Joan was 48 on December 31, 1998, then she was born on December 31, 1950.  That would mean Joan was 65 on December 31, 2015.

102.     2000 was the only year prior to Joan turning age 65 in which the interest crediting rate exceeded 6.00%.  In fact, the average interest crediting rate from 1999 through 2015 was roughly 4.5%.

103.     Assuming that the interest crediting rate was a consistent 5.00%, the $43,916 opening account would grow to $43,916 X $1.05 ^ (65 – 48)$ = $100,656.28.

104.     The age 65 factor to convert the account into an annual annuity, using the same mortality table used in 1999, but at 5.00% interest rate, would be a factor of 11.53399 rather than the 10.64635 factor used to create the opening account balance.

105.     Using the 11.53399 conversion factor and an age 65 cash balance account benefit of $100,656.28, would produce an annual annuity benefit of $8,726.93.

106.     $8,726.93 is only 72% of Joan's December 31, 1998 benefit of $12,144.

107.     If the opening account only produces a benefit of 72% of the already earned benefit, that means that any pay credits earned after December 31, 1998 do not actually increase Joan's benefit, until such time as the pay credits are sufficient to cover the additional 28% of Joan's

December 31, 1998 benefit that is not provided by her $43,916 opening account. To say this differently the opening account "did not "represent the full value of the benefit that employees had earned for service before" 1999. *CIGNA Corp. v. Amara*, 563 U.S. 421, 429, (2011).

108.    **Exhibit A** further provides that "Joan began participating in the NSUH Pension Plan as of January 1, 1970." Assuming that Joan began participating in the NSUH Pension Plan on January 1, 1970, and she "continued as an active participant in the NSUH Pension Plan through December 31, 1998" (*see* **Exhibit A**) then she had 29 years of service as of December 31, 1998. Joan would turn 55 on December 31, 2005, with 36 years of service, at which point her age plus service would exceed 80, meaning that Joan would be eligible to receive the $12,144 annual annuity benefit, without reduction, on December 31, 2005.

109.    The age 55 factor to convert the account into an annual annuity, using the same mortality table used in 1999, at 5% is 14.35040.

110.    Joan's opening account of $43,916 would grow at 5.00%, so that at age 55, her opening account would have grown to $43,916 X 1.05 ^ (55 – 48) = $61,794.22.

111.    Using the conversion factor of 14.35040, the age 55 account of $61,794.22 attributable to her opening account would provide an age 55 annual annuity of $4,306.10.

112.    $4,306.10 is only 35% of the $12,144 benefit that Joan was already entitled to, assuming she remained employed until (and retired at) age 55.

113.    That means that Joan earned no additional age 55 benefit, until the pay credits were sufficient to cover the additional 65% of her already earned benefit that was not provided by her opening account balance.

114.    The benefit shortfall at age 55 of $12,144 - $4,306.22 = $7,838.90 based upon a

conversion factor of 14.35040 would be equivalent to an account of $7,837.90 X 14.35040 or $112,477.07.

115.    **Exhibit A** further provides that assuming Joan earns $15,000 a quarter in 1999, and has a pay based credit of 3% of pay plus a transition credit of 2.5% of pay, that means her pay credit for each quarter in 1999 is $825.

116.    Assume that Joan receives a 5% salary increase each year, effective January 1 of that year.  That means that Joan's total account at age 55 (on December 31, 2005), assuming a constant 5.00% interest crediting rate (which was equal to the 30-year treasury rate), would be roughly $93,324.96 (the $42,916 opening account balance, which would grow to $61,794.22 plus the post-1998 pay credits with interest of $31,530.74).

117.    That means, it would be very likely that Joan would have absolutely no increase in her age 55 benefit because the accumulated value of the additional pay credits and transition credits with interest (*e.g.*, $31,530.74 assuming a 5% 30-year treasury rate and 5% annual salary increases) would be insufficient to cover the portion of her age 55 benefit not covered by her opening account balance (*e.g.*, $112,477.07 assuming a 30-year treasury rate of 5%).

118.    There can be no dispute that in 1999, Joan would almost certainly have been subject to an extended period of wear-away on her age 55 benefit.

119.    Similarly, there can be no dispute that in 1999, Joan would very likely have been subject to some period of wear-away on her age 65 benefit.

120.    There are three reasons that Joan's opening account balance falls short of providing the full benefit to which she was already entitled.

121.    The first reason is because the benefit was discounted at 6.00% when determining

the opening account, but assuming that the 30-year treasury rate was a constant 5.00%, the account only grew at 5.00%. (Recall that as pointed out above, the actual interest crediting rates averaged less than 5.00%.) Thus, Joan's account falls short because of this interest arbitrage.

122.    It would have been clear in late 1998 and in 1999 that there was a very real chance that the 30-year treasury rates could be less than 6.00% because the monthly 30-year treasury rates during all of 1998 were below 6.00% and the December 1998 rate was actually only 5.06%.

123.    In December 1999, when **Exhibit A** was provided to plan participants, Defendants already knew that the 30-year treasury rate applicable for 1999, *i.e.*, the interest crediting rate for 1999, would be 5.15%. In other words, in 1999, when **Exhibit A** was prepared, Defendants knew that there was a very real chance that the 30-year treasury rate and the interest crediting rate could be significantly less than 6.00%, because it already was.

124.    In contrast, the average plan participant would not know, based upon the information in **Exhibit A**, that the current interest crediting rate in 1999 was less than the discount rate used to determine the opening account balance.

125.    The second reason Joan's opening account balance falls short is because the benefit was discounted from age 65 even though, assuming that Joan continued in active service until age 63, and Joan had only 10 years of service as of December 31, 1998, Joan would have been entitled to her full $12,144 annual benefit, unreduced at age 63. The value of the early retirement benefit could easily be as much as the benefit discounted from age 65. As we saw, while Joan's opening account provided 72% of her age 65 benefit, it only provided 35% of her age 55 benefit, meaning that the opening account necessary to replace the full value of her age 55 benefit was more than double the value needed to replace the value of her age 65 benefit.

126.    The third reason Joan's opening account balance falls short is because Joan's opening account balance was reduced by a factor of 0.91467 representing the probability of survival to age 65. But, as Joan survived each year, her opening account balance was not increased to reflect her survival. Thus, the opening account balance was reduced by the 0.91467 factor, but with no potential of recovering that reduction.

127.    Defendants therefore knew that because of the way they set up the new cash balance plan, it was probable that a participant's opening account balance would provide a smaller benefit than the amount to which that participant would have been entitled to receive at normal or early retirement age had they earned no additional benefit after December 31, 1998. To say that differently, Defendants knew in 1999, when communicating the amendment to plan participants, that the opening account was very likely to be insufficient to provide the benefit that the participant was already entitled to prior to the amendment, and, as Joan illustrates, potentially falling well short of providing the benefit to which Joan was entitled to prior to the amendment.

***Significantly Reduced Benefit Accruals***

128.    In addition to effectively freezing future benefit accruals for periods of time, Defendants' conversion to the Cash Balance Provisions of the amended Plan also significantly reduced the rate of future benefit accruals for Named Plaintiffs and other members of the proposed Class.

129.    By way of example turning back to the hypothetical individual, Joan, from **Exhibit A**, if Joan continued in employment until age 65, she received 5% salary increases each January 1, and the 30-year treasury rate was a constant 5.00%, her cash balance account would be roughly $225,388.31 at age 65. Using the 11.53399 conversion factor, her age 65 annual annuity benefit

would be $225,388.31 / 11.53399 or $19,541.23.

130.    Under the Legacy Formula, her benefit would increase by 1.50% of her basic compensation and 2.00% of her excess compensation until she had 30 years of service. Since she already had 29 years of service as of December 31, 1998, she would be under this formula for only 1999. If she earns $15,000 a quarter, that means she would earn $60,000 in 1999. Assuming that it is all basic compensation, Joan's benefit would grow by 1.50% X $60,000 or $900 for 1999.

131.    Starting in 2000, her 31st year of service, Joan would earn 1.50% of basic compensation. Assuming that all her compensation is basic compensation, she would earn an additional $11,886 of benefit at age 65.

132.    The sum of the already accrued annual benefit of $12,144, as of December 31, 1998, plus the 1999 accrual of $900, plus the accrual of $11,886 for years of service 31-40, produces a total benefit under the prior formula of $24,930.

133.    If the expected annual benefit under the prior formula at age 65 is $24,930 and the expected annual benefit under the cash balance formula is $19,541.23, this would mean that the cash balance benefit produces a lower age 65 benefit than under the Legacy Formula.

134.    The reduction in the age 65 benefit is an unsurprising result, especially with salary increases and a lower than 6% 30-year treasury rate.

135.    If, instead, it is assumed that Joan's 1998 compensation of $41,000 remained constant, she would earn a benefit of $615 in 1999 (the same as in 1998) and the same $615 for the 31st through 40th year of service, for a total of 11 years at $615, or $6,765 for years after 1998.

136.    Combining the $12,144 Joan had earned as of December 31, 1998, with the $6,765 she would earn after 1998, her total expected annual benefit at age 65, assuming continued

employment, but constant future salary, would be $18,909.

137.     Assuming constant future salary of $41,000, the base pay credit plus transition credit of 5.5% and a constant interest crediting rate of the 1999 interest crediting rate of 5.15%, Joan would have an account balance at age 65 of roughly $191,177.37.

138.     The age 65 conversion factor, using a 5.15% interest crediting rate and the mortality table used to create the opening account balance, is 11.39269.

139.     Using an age 65 account balance of $191,177.37 and a conversion factor of 11.39269, the cash balance benefit at age 65 would be an annual annuity of $16,780.71.

140.     If the Legacy Formula age 65 annual benefit for Joan would be $18,909 and the cash balance formula age 65 annual benefit for Joan would be $16,780.71, then the conversion of the plan from the Legacy Formula to the cash balance formula represented a potential significant risk of a reduction in Joan's benefit.

141.     The Named Plaintiffs and Class Members similarly experienced a significant reduction in their expected future accruals as a result of the conversion, in addition to working for years without any additional retirement benefits.

***Misleading Plan Communications Regarding the 1999 Amendment***

142.     Beginning in or around 1998, Defendants issued communications to its employees that it knew contained materially false and misleading statements and omissions concerning amendments to the Plan.

143.     For instance, Defendants prepared a letter dated December 16, 1998, addressed to employees in the NSUH Pension Plan, a group which also includes Class Members.

144.     This letter provided:

We are pleased to announce that effective January 1, 1999 you will be a participant in our new Retirement Program, the details of which will be sent to your home shortly. The Health System will commence employer contributions to the new Retirement Program as of January 1, 1999. Concurrent with the new Program, we are required to inform you that . . . the accruals under the North Shore University Hospital Pension Plan will stop as of January 1, 1999.

We are confident that as you learn about your new Retirement Program, you will feel as we do, that the Health System has accomplished one of our major goals, which is assisting you toward financial security in your retirement years.

145.    Here, this letter failed to set forth the Plan amendment that would result in accruals under the NSUH Pension Plan stalled as of January 1, 1999.

146.    Moreover, the letter stating that the new "Retirement Program," which includes the Cash Balance Plan, will assist employees towards financial security in their retirement years is plainly misleading, where, as discussed in more detail above, Defendants knew that the conversion occurring under the new Retirement Program would result in employees' pension benefits experiencing periods of "wear-away," as well as a significant reduction in their benefit available at retirement. Such representations fell far short of those required of a fiduciary.

147.    As another example, Defendants also prepared and distributed a brochure, entitled "The Retirement Program," concerning a retirement program effective January 1, 1999.

148.    This brochure, at page 2, tells readers that the Retirement Program consists of two plans: The 403(b) Plan and The Cash Balance Plan, and that these plans will "help you build a solid foundation for your retirement income."

149.    This brochure, at page 9, also tells readers that "The Cash Balance Plan offers an innovative approach to pension plan design that: Offers the stability of a traditional pension plan[;] Allows you to know the value of your benefit at any given time[;] [and] Provides a benefit that grows over your career with the Health System."

150.    Again, such representations fell far short of those required of a fiduciary. Instead of disclosing the potential significant adverse ramifications the conversion would have on a participant's benefit, Defendants emphasized an alleged growth in benefits that a participant would experience during their career. This emphasis is clearly misleading, as the Cash Balance Plan did not preserve the full value of each employee's accrued Legacy Plan benefits. None of the materials or examples provided to participants represent the effect of wear-away nor the lack of increase in the actual realized value of their available pension benefits.  In fact, the new formula did not always provide "a benefit that grows over your career" as Joan illustrated.

151.    As yet another example of a misleading communication prepared by Defendants, Defendants prepared a letter dated January 6, 1999, addressed to NS-LIJHS employees, which provided further information regarding their new Retirement Program that became effective January 1, 1999, including enrollment information.

152.    With respect to the Cash Balance Plan, participants were informed:

> You do not need to take any action to enroll. If you have an accrued benefit under the North Shore University Hospital Pension Plan and are an active participant in the Cash Balance Plan as of January 1, 1999, the value of your Pension Plan benefit as of December 31, 1998 will automatically become your opening balance in the Cash Balance Plan effective January 1, 1999. Your accrual of benefits under the Plan's current formula stops as of December 31, 1998. You will receive a statement showing your Cash Balance Plan opening balance following the close of the first quarter of 1999.

153.    Here, informing employees, including Class Members, that "the value of your Pension Plan benefit as of December 31, 1998 will automatically become your opening balance in the Cash Balance Plan effective January 1, 1999," is plainly misleading where, as discussed in more detail above, Defendants knew that it was probable that a participant's opening account balance would provide a smaller benefit than the amount to which that participant would have been entitled

to receive at normal or early retirement age had they earned no additional benefit after December 31, 1998.

154.    Defendants also prepared a letter dated December 1999 to Class Members, which enclosed the Summary Plan Description ("SPD") which "reflects detailed provisions of the Cash Balance."

155.    Under 29 U.S.C. § 1022, the SPD was required to be "written in a manner calculated to be understood by the average plan participant."

156.    The SPD's special provision affecting former participants of the North Shore University Hospital Pension Plan represents to Class Members how their "Opening Account Balance" was determined in the Cash Balance Plan.

> Your "Opening Account Balance" in the Cash Balance Plan is determined by converting your December 31, 1998 accrued benefit under the NSUH Pension Plan benefit formula to its present value on January 1, 1999. This conversion method assures that you receive a starting value in the Cash Balance Plan which is "actuarially equivalent" to the value of the benefit you had accrued under the NSUH Pension Plan's benefit formula assuming that you retire at age 65.

157.    The SPD also included **Exhibit A** attached hereto and referenced above, which provided examples through hypothetical individual, Joan. As discussed in more detail above, not only was it misleading to represent to participants that their opening account balance in the Cash Balance Plan would be "actuarially equivalent" to the value they had previously accrued under the NSUH Pension Plan (because in reality the opening account balances fell short of providing the full benefit to which a participant was already entitled), the SPD, including the portion attached hereto as **Exhibit A**, was not written in a manner, nor does it provide sufficient information, that would allow an average plan participant to understand why their opening account balances fell

short of providing the full benefit to which they were already entitled.[5]

158.    For example, **Exhibit A** does not disclose the basis of how the 3.6163 conversion factor was determined, including for example, what interest rate and what mortality table was used in determining the factor.

159.    The 3.6163 factor can be reproduced as the product of (1) the factor at age 65 to convert a benefit of $1 a year payable monthly into a lump sum, of 10.64635, determined using 6.00% interest and Internal Revenue Code section 417(e) applicable mortality table in force at the time (1983 Group Annuity Mortality Table Unisex); (2) the probability of survival from age 48 to age 65 of 0.91467 based upon the Internal Revenue Code section 417(e) applicable mortality table; and (3) a 6.00% interest discount from age 65 to age 48 (*i.e.*, $1/1.06 \wedge (65\text{-}48)$ or 0.37136). 10.64635 X 0.91467 X 0.37136 = the factor used of 3.6163.

160.    The average plan participant would be unable to determine how the 3.6163 factor was determined; however, Defendants knew how the 3.6163 factor in **Exhibit A** was determined. Defendants knew that the 3.6163 factor was based upon a 6.00% discount rate.

## CLASS ACTION ALLEGATIONS

161.    Named Plaintiffs' and Class Members' claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23 ("Rule 23").

162.    The Rule 23 Class is defined as follows:

> All persons who were participants in the Plan on January 1, 1999, and accrued additional benefits after January 1, 1999 pursuant to the Cash Balance Provisions of the Plan, and who were either paid a benefit from the Plan after January 1, 1999, or are still entitled to a benefit from the Plan; and the beneficiaries and estates of

---

[5]    Named Plaintiffs and the members of the proposed Class received initial opening account balances in their cash balance account based upon Defendants' determination of the purported "actuarial equivalent" lump sum value of their accrued benefits, as of January 1, 1999, under the Legacy Plans' prior formulas based upon the same method and assumptions as in the example in **Exhibit A**.

such persons and alternate payees under a Qualified Domestic Relations Order.

163.    The class action is maintainable under subsection (2) of Rule 23(b) because Plaintiffs seek and are entitled to relief, including, but not limited to, the reformation of the Plan to conform its terms to provide Named Plaintiffs and other Class Members with the benefits that they reasonably believed they were receiving under the Plan.

164.    That is, Defendants have acted and/or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive and other equitable relief in favor of the Class as a whole.

165.    The class action is also maintainable under subsections (1), (2), (3) and (4) of Rule 23(a).

166.    The Class is so numerous that joinder of all members is impracticable. The size of the Class is believed to be over 50.

167.    Common issues of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class Members. Among the common issues of law and fact are the following:

- Whether Defendants are fiduciaries of the Plan;
- Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;
- Whether Defendants violated ERISA's strict fiduciary standards by preparing and disseminating participant communications with the intent to conceal the wear-away and/or that had the effect of concealing wear-away and with the intent to conceal and/or that had the effect of concealing the reductions in benefits both at normal and early retirement; and
- Whether, as a result of the intentional and/or reckless misrepresentations and omissions made by Defendants in Plan documents and other Plan communications, Class Members were ignorant of the truth about their retirement benefits.

168.    These common questions of law and fact also predominate over any questions affecting only individual Class Members.

169.    The Named Plaintiffs' claims are typical of the claims of other members of the Class because Named Plaintiffs, like other Class Members, were participants in the Plan on January 1, 1999, accrued additional benefits after January 1, 1999 pursuant to the Cash Balance Provisions of the Plan and who were either paid a benefit from the Plan after January 1, 1999, or are still entitled to a benefit from the Plan; and have suffered injuries due to Defendants' imprudence. Defendants treated Named Plaintiffs the same as members of the Class with respect to the Plan.

170.    Named Plaintiffs and their counsel will fairly and adequately protect the interests of the Class. Named Plaintiffs have no interest antagonistic to the Class and have retained counsel experienced in complex class action litigation.

171.    Class counsel, Thomas & Solomon PLLC, is qualified and able to litigate Named Plaintiffs' and Class Members' claims.

172.    Thomas & Solomon PLLC concentrates its practice in employment litigation, and its attorneys are experienced in class action litigation.

173.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy and avoids duplication by allowing these claims to be prosecuted in a single action. Named Plaintiffs and Class Members lack the resources to adequately prosecute separate claims.

174.    Moreover, the class action is maintainable under subsection (3) of Rule 23(b) because the Named Plaintiffs and Class Members seek to resolve common questions of law and fact that predominate among the Named Plaintiffs and Class Members and the class action is

superior to other available methods for the fair and efficient adjudication of the controversy.

175.     The Class is also maintainable under Rule 23(c)(4) because resolution of the common issues will significantly advance the litigation or entitle Plaintiffs to injunctive relief.

### FIRST CAUSE OF ACTION
*Violation of 29 U.S.C. § 1054(h)*

176.     Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent causes of action as if fully restated herein.

177.     In 1999, 29 U.S.C. § 1054(h) provided that:

> A plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to . . .each participant in the plan . . .

178.     Under the law, an amendment to a defined benefit plan affects the rate of future benefit accrual if it is reasonably expected to change the amount of the future annual benefit commencing at normal retirement age. *See* 26 C.F.R. § 1.411(d)-6, Q&A-5(a)(1). This determination is made by comparing the "amount of the annual benefit commencing at normal retirement age as determined under Q&A-5(a)(1) under the terms of the plan as amended, with the amount of the annual benefit commencing at normal retirement age as determined under Q&A-5(a)(1) under the terms of the plan prior to amendment." *See* 26 C.F.R. § 1.411(d)-6, Q&A-7.

179.     The amendment provided for a significant reduction in the rate of Named Plaintiffs' and proposed Class Members' future benefit accruals within the meaning of 29 U.S.C. § 1054(h).

180.     The reduction in the rate of future benefit accrual was illustrated above for Joan both assuming that current factors remained constant and assuming potential changes in factors,

such as future salary increases.

181.    Notwithstanding the law's requirements, Named Plaintiffs have no records of, nor any recollection that that the Defendants provided the Named Plaintiffs or members of the proposed Class with the required written notice which set forth the text of the amendment which created the newly adopted Cash Balance Plan provisions.

182.    Nor did the Defendants fairly or sufficiently summarize the amendment in a manner calculated to be understood by the average plan participant, which necessarily would have to include disclosure of the significant reduction in the rate of future benefit accruals, or, in the alternative, sufficient information that a participant could determine their benefit after the amendment with sufficient detail so as to enable the participant to compare the benefit under the amended Plan to what the benefit would have been had the Plan not been amended.

183.    Any written notice that was provided to Named Plaintiffs or members of the proposed Class did not put participants on notice of the potential reduction in the rate of future benefit accruals, which is the purpose of a 204(h) notice.

184.    In fact, to the contrary, the clear indication of the communications was that the amendment was an improvement to the Plan rather than a reduction in benefits.

185.    Any written notice that was provided contained false or misleading material misstatements or omissions that concealed that the amendment provided for a significant reduction in the rate of future benefit accrual or concealed the extent to which it did so.

186.    Defendants' failure to notify Named Plaintiffs and other Plan participants of a significant reduction in the rate and/or a freeze of future benefit accruals in conformance with statutory requirements 15 days prior to the January 1, 1999, effective date of the amendment

violated the 29 U.S.C. § 1054(h), prohibition on such Plan amendments in the absence of such notice.

187.     Accordingly, pursuant to 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed Class seek and are entitled to relief, including nullification of the amendment, together with all other appropriate equitable and make-whole relief.

## SECOND CAUSE OF ACTION
### *Violation of 29 U.S.C. § 1022*

188.     Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent cause of action as if fully restated herein.

189.     Throughout the relevant time, 29 U.S.C. § 1022 has required that participants be furnished with a SPD that is "written in a manner calculated to be understood by the average plan participant," 29 U.S.C. § 1022(a), is "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan," *id.,* and includes the plan's eligibility requirements, as well as the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(a)-(b); *see also* 29 C.F.R. § 2520.102-3(1).

190.     Defendants' failure to explain the full import of the amendment and its newly adopted Cash Balance Provisions in a SPD distributed to plan participants, including but not limited to a complete explanation of the wear-away effect (more specifically that the benefit could not be less than the already accrued benefit, and how that minimum would impact a plan participant, such as Joan's post amendment accruals) and legally required continued availability of subsidized early retirement subsidies, violated and violates the minimum requirements for SPDs set forth in 29 U.S.C. § 1022 and its corresponding regulations set forth under 29 C.F.R. §

2520.102.

191.     In connection with the amendment, Defendants also failed to provide a Summary of Material Modifications to the plan participants as required by 29 C.F.R. § 2520.104b-3.

192.     In the event communications prior to the Date of Conversion are considered SPDs, and subsequent to the Date of Conversion, Defendants have issued SPDs that were not and are not "written in a manner calculated to be understood by the average plan participant," 29 U.S.C. § 1022(a),  were not and are not "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights," *id.*, under the Plan, and did and do not disclose the existence or extent of the wear-away effect.  29 U.S.C. § 1022(a)-(b); *see also* 29 C.F.R. § 2520.102-3(1).  Nowhere in the post amendment communications does it disclose how the account is converted into the annual annuity benefit payable at age 65, which, by definition, is the plan benefit.  Since the prior benefit was only disclosed in terms of the benefit payable as the annual annuity benefit payable at age 65 (or the reduced annual annuity benefit payable at early retirement ages), there is no way, from the communications, for a participant to determine both the prior benefit and the new benefit in the same terms, for example, to compare them as the annual annuity payable at age 65 (or any other age).  That means that there was no way for an average plan participant to determine if, and under what circumstances, the amendment could result in a reduction in benefits, and to what extent the participant was impacted by wear away.  In fact, by equating the benefit to the account, and growth in the account to growth in the benefit, the communications overtly hid that wear-away could even exist, *i.e.* that the account could be growing while the benefit accrual was stalled at the December 31, 1998 already earned benefit.

193.     The SPDs contain and contained materially false and misleading statements and

omissions regarding Named Plaintiffs' and the proposed Class Members' benefit accruals and rate of benefit accruals under the amended Plan, all of which were intentionally designed to mislead participants about and/or conceal both (1) the existence and extent of the wear-away effect and to prevent Plan participants from discovering that Defendants had failed to disclose and had misled them about the existence of wear-away; and (2) the impact of the conversion on the ultimate benefit payable at normal and early retirement.

194.    Defendants converted Named Plaintiffs' and Class Members' accrued benefit prior to January 1, 1999, to an opening account balance pursuant to the Cash Balance Plan provisions, and did so using a conversion method that froze a participant's pension accruals until such time that the participant was no longer in a period of "wear-away."

195.    Therefore, Defendants knew, or should have known, that the rate of benefit accruals under the new Cash Balance Provisions were very likely going to be much lower than those under the prior formula.

196.    In other words, Defendants knew something that the participants did not: the new cash balance formula was a significant benefit cut to those participants.

197.    Despite Defendants' actions, they deliberately described the conversion in a manner that would lead participants to mistakenly, but reasonably, believe that they would not only retain the full value of their previously accrued benefits, including early retirement benefits, but that they would immediately be earning new additional benefits under the Plan at a rate that would result in an ultimate benefit that was not significantly lower than they would have earned under the prior Plan formulas.

198.    Defendants should have had little to no doubt that every participant that accrued

additional benefits after January 1, 1999 pursuant to the Cash Balance Provisions of the Plan, would earn no additional retirement benefits under the Plan for some period of time following the effective date of the 1999 amendment – *i.e.*, that every Plan participant who is a member of the proposed Class would experience a period of wear-away following the effective date of the cash balance conversion. Named Plaintiffs and every member of the proposed Class did in fact experience a period of wear-away following the Date of Conversion.

199.    Defendants intentionally undertook to conceal these facts from Named Plaintiffs and the members of the proposed Class via omissions and/or misleading communications.

200.    Defendants' false and misleading statements and omissions regarding wear-away and protected benefit accruals were and are self-concealing and were (and continue to be) part of Defendants' attempt to fraudulently conceal the underlying ERISA violations alleged here.

201.    As Joan illustrates, after credits for the first quarter, her account balance would be $45,295.82, but her 417(e) minimum required lump sum as of March 31, 1999 would be the protected age 65 annual benefit already accrued as of December 31, 1998 of $12,144 times the age 65 conversion factor of 11.39269 (determined at the 1999 interest rate of 5.15%) discounted at the 1999 interest rate of 5.15% for the 16.75 years for March 31, 1999 until Joan's 65th birthday, would be $12,144 X 11.39269 / 1.0515 ^ 16.75 = $59,659.90.  Even if the plan could have further discounted for the probability of survival from age 48 until age 65 (*i.e.* ignoring the small increase in survival from age 48.25 rather than from age 48.00) and using the factor used to create the opening account balance of 0.91467, the minimum lump sum required for Joan would be $59,659.90 X 0.91467 or $54,569.22, $9,273.40 more than the benefit equal to her $45,295.82 account balance that would have been communicated to her.  In other words, when, in 1999 she would have been told that her

lump sum benefit was $45,295.82, that would have been false (because her benefit was, at worst, $54,569.22, and more appropriately $59,659.90) and misleading (because it illustrated that her pay credits were increasing her benefit, when in fact, until she received roughly $10,000 worth of pay credits, interest adjusted (which would take years) the pay credits provided no increase in her benefit at all).

202.    Even if the minimum lump sum for Joan is $54,569.22, but her account balance is $45,295.82, that means her account balance is only 83% of her protected minimum lump sum.

203.    This further means that Joan received no increase in her benefit due to the $825 pay credit she received in the first quarter of 1999, because her benefit would be the higher protected minimum lump sum.

204.    Assuming that the plan is prohibited from using mortality prior to age 65 when determining the minimum lump sum, then, while the cash balance account would grow each year with both pay credits and interest credits, the protected minimum lump sum would only grow with interest at the 5.15%. Assuming constant future salary, and that the interest rate remained constant, Joan's cash balance account would exceed her protected minimum lump sum in roughly June 2004, when her protected minimum lump sum, based upon the December 31, 1998, accrued benefit of $12,144 would be $77,657.11 and her account (after the pay credit for June 2004) would be $78,659.20.

205.    At any point at which Joan's cash balance account is less than the protected minimum lump sum value, she has received no growth in her benefit from the plan after the conversion, and no value from the pay credits.

206.    When the mortality tables are updated to reflect longer life expectancies (as they

were prior to 2004) it increases the protected minimum lump sum, thus extending the point at which the cash balance account exceeds the protected minimum lump sum value.

207.    When interest rates decline, as they did, it increases the protected minimum lump sum value, thus extending the point at which the cash balance account exceeds the protected minimum lump sum value, as well as decreasing the rate at which the cash balance account grows (because of the lower interest credits) which also extends the point at which the case balance account exceeds the protected minimum lump sum value.

208.    If the applicable interest rates in 2015 (when Joan turns age 65) are 1.24% for payments made in the first 5 years, 3.86% for payment made in the next 15 years and 4.96 for payments made in over 20 years (the 417(e) minimum lump sum factors based upon the August 2014 rates), then using the applicable mortality table in effect in 2015, the age 65 conversion factor would be roughly 13.42, which would make the minimum protected lump sum $12,144 X 13.42 or $162,972.48. Assuming that Joan's salary in 1999 is her 1998 salary, increased by 5%, and that it increases 5% each January 1st thereafter, Joan's cash balance account balance, based upon the actual history of interest rates would be less than $210,000. If Joan's cash balance account was $210,000, that would mean that all of the pay credits for the 17 years from January 1, 1999 through December 31, 2015 only provided a benefit increase over the protected benefit of $47,027.52, or an average (including interest) of $2,776.32 per year, even though the average pay credit, with interest from when the pay credit was posted until December 31, 2015 would be roughly $6,800 a year. In other words, less than half of the pay credits over the 17 years would actually have been increasing Joan's benefit.

209.    That means that when Defendants were telling a participant like Joan that her

benefit was growing, each year, by the amount of the pay credits that was simply false.

210.    These examples of the false and misleading statements and omissions made by Defendants were not isolated incidents, but part of a pattern of fraud and fraudulent concealment found in most if not all of Defendants' communications with participants about the Cash Balance Plan provisions, designed in part to avoid incurring the liability that may result if one or more of the claims made here are successful.

211.    Accordingly, pursuant to 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed Class seek and are entitled to relief, including, but not limited to, reformation of the Plan to conform its terms to provide Named Plaintiffs and other Class Members with the benefits that they reasonably believed they were receiving under the Plan, to wit, that the accrued benefit under the new Cash Balance Provisions of the Plan would include and protect all previously accrued benefits under the Legacy Plans, including early retirement benefits, and that benefits under the Cash Balance Plan provisions would immediately begin accruing additional benefits, and, further, would do so at rates resulting in benefits (when the benefit was ultimately paid) comparable to those under the Legacy Plans, together with all other appropriate equitable and make-whole relief including surcharge of the Plan fiduciaries and disgorgement of any unjust enrichment by the Defendants.

### THIRD CAUSE OF ACTION
### *Violation of 29 U.S.C. § 1104(a)*

212.    Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent causes of action as if fully restated herein.

213.    Defendants breached their strict fiduciary duties under 29 U.S.C. § 1104(a) by intentionally, recklessly or negligently making the materially false and misleading statements and

omissions described above, both before and after the adoption of the 1999 amendment; by intentionally, recklessly or negligently violating 29 U.S.C. §§ 1002, 1054(h), and 1104(a); and by fraudulently concealing or attempting to fraudulently conceal those violations and the violations of 29 U.S.C. § 1054(b)(1)(H), as described above.

214.    ERISA imposes fiduciary duties of loyalty, care, and prudence upon Defendants as fiduciaries to the Plan. These fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

215.    Under 29 U.S.C. § 1104(a)(1), a fiduciary (when acting in a fiduciary capacity) is not permitted to balance the interests of plan participants and the plan's sponsor: the focus on participants must be "exclusive."

216.    Both before and following the purported effective date of the Amendment, the Defendants intentionally and/or recklessly made and continued making materially false and misleading statements and omissions designed to (and/or that did in fact) conceal the Plan's wear-away effect; and designed to (and/or that did in fact) prevent Plan participants from discovering that Defendants had failed to disclose and had misled them about the existence of wear-away and about how the rate of benefit accrual under the Plan was significantly less than under the Legacy Plan(s).

217.    Any communication provided was intended to, and did, lead an average participant to think that their "benefit" under the Plan was properly preserved under the new Plan amended and restated as of January 1, 1999; that he/she could monitor the increase in their benefit entitlement simply by watching the account grow; and that the account – and therefore their benefit – would indeed grow each year by the amount of the "yearly contribution" Defendants would make

to the account. But all of this was false: a Plan participant's already accrued benefit was not adequately reflected in a participant's opening account balance and the growth in the account balance would not necessarily represent an increase in the participant's benefit entitlement because the account balance had no new "value" unless and until employees worked long enough to wear-away the value of their benefit already accrued under the Plan prior to January 1, 1999. Defendants knew all of this, and accordingly knew that their representations were false and misleading.

218.    The intentional and/or reckless misrepresentations and omissions made by Defendants in Plan documents and other Plan communications, constitute a breach of fiduciary duty under 29 U.S.C. § 1104(a).

219.    Further, Named Plaintiffs and the members of the proposed Class were harmed by Defendants' violations of law and the false or misleading statements and omissions referenced above.

220.    Defendants' failure to provide notice of the significant reduction in the future rate of benefit accrual in accordance with the requirements of 29 U.S.C. § 1054(h), failure to provide adequate and non-misleading SPDs in accordance with the requirements of 29 U.S.C. § 1022, and corresponding breaches of fiduciary duty for those failures, harmed Named Plaintiffs and other members of the proposed Class, including by depriving them of the right to the information required by 29 U.S.C. §§ 1002, 1054(h), and 1104(a), and the opportunity to contest or react to those changes with that information; by depriving them of the opportunity to benefit from action employees may have taken as a group to contest or protest the changes (*e.g.*, by demanding higher benefits and/or obtaining timely Union representation); and by depriving them of the greater

benefits (and/or less significant reductions) that may have resulted had the Defendants fully and honestly disclosed the entirety of the effects of the Amendment, among other things.

221.    Accordingly, pursuant to 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed Class seek and are entitled to relief, including nullification of the Amendment, reformation of the Amendment and/or the Plan to conform the terms to provide Named Plaintiffs and other Class Members with the benefits that they reasonably believed they were receiving under the Plan, to wit, that the accrued benefit under the new Cash Balance Provisions of the Plan would include and protect all previously accrued benefits under the Legacy Plan, including early retirement benefits, and that benefits under the Cash Balance Plan provisions would begin accruing immediately and would do so at rates such that the ultimate benefits would be comparable to those under the Legacy Plans, together with all other appropriate equitable and make-whole relief including surcharge of the Plan fiduciaries and disgorgement of any unjust enrichment by the Defendants.

**WHEREFORE**, Named Plaintiffs pray that Judgment be entered against Defendants and that the Court award the following relief:

a.    a declaration that Defendants have breached their fiduciary duties under ERISA;

b.    an order certifying the Class as requested and designating Thomas & Solomon PLLC as Class Counsel;

c.    designation of William Lorusso, Margaret Gurlides, Linda Moriarty, Richard Seaberg, Gary Leonard, Carol Vorperian, Nicholas Campagnola, Jerold Scherer, Denise Bevilacqua, and Karen Cervantes as Class Representatives;

d.    judgment for Named Plaintiffs and the Class against Defendants on all claims expressly asserted and/or within the ambit of this Complaint;

e.    an order enjoining the Plan Administrator from continuing to violate the

law and/or the terms of the Plan including such terms of the Plan as are implied by law in the manners alleged or referenced in this Complaint or shown by the facts;

f.  an order nullifying the amendment or, in the alternative, reforming the Plan to bring the terms and administration of the Plan into compliance with the law, in all cases effective as of the date the alleged violations first occurred and taking into account all accrued benefits;

g.  an order surcharging Defendants for the full amount for Named Plaintiffs and Class Members' benefits in order to make Plaintiffs whole;

h.  following entry of predicate relief and/or reformation of the Plan that conforms its terms to the requirements of the law, a further order requiring Defendants to recalculate the benefit amounts due or past due under the terms of the Plan in accordance with the requirements of ERISA, and, where applicable, for the Plan to pay the difference, plus interest, to or on behalf of all Class Members who received less in benefits or benefit accruals than the amount to which they are entitled and/or to pay benefits to which Class Members are entitled in all applicable optional forms;

i.  an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Named Plaintiffs' and Class Members' rights pursuant to 29 U.S.C. § 1132(g);

j.  an order awarding pre- and post-judgment interest;

k.  service payments for the Named Plaintiffs; and

l.  an order awarding, declaring or otherwise providing Named Plaintiffs and the Class all other such relief under 29 U.S.C. § 1132(a), or any other applicable law, that Named Plaintiffs may subsequently specify and/or that the Court may deem appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.


Dated:  April 15, 2024

**THOMAS & SOLOMON PLLC**

By:      /s/ J. Nelson Thomas
         J. Nelson Thomas, Esq.
         Jessica L. Lukasiewicz, Esq.
         *Attorneys for Plaintiffs and Class Members*
         693 East Avenue
         Rochester, New York 14607
         Telephone: (585) 272-0540
         nthomas@theemploymentattorneys.com
         jlukasiewicz@theemploymentattorneys.com