UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM LORUSSO, MARGARET GURLIDES, LINDA MORIARTY, RICHARD SEABERG, GARY LEONARD, CAROL VORPERIAN, NICHOLAS CAMPAGNOLA, JEROLD SCHERER, DENISE BEVILACQUA, AND KAREN CERVANTES, *on behalf of themselves and all others similarly situated,*<br><br>*Plaintiffs,*<br><br>v.<br><br>NORTHWELL HEALTH PENSION PLAN, NORTH SHORE UNIVERSITY HOSPITAL, NORTHWELL HEALTH, INC., PENSION COMMITTEE, AND ABC PENSION COMMITTEES 1-20 (SAME NAMES BEING FICTICIOUS),<br><br>*Defendants.* | FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL<br><br>**Civil Action No.**<br>**2:24-cv-02785** |

Plaintiffs, individually and on behalf of all other similarly situated participants and beneficiaries, by and through their counsel, Thomas and Solomon PLLC, bring this class action complaint against Northwell Health Pension Plan f/k/a Northwell Health Cash Balance Plan f/k/a North Shore-Long Island Jewish Health System Cash Balance Plan f/k/a North Shore University Hospital Pension Plan; North Shore University Hospital; Northwell Health, Inc.; Pension Committee; and ABC Pension Committees 1-20 (same names being fictitious)[1] (collectively "Defendants"), and allege as follows:

## NATURE OF ACTION

1.      This is a class action under the Employee Retirement Income Security Act of 1974,

---

[1]      The "Pension Committee" includes all iterations of the term Pension Committee, as defined by the Northwell Health Pension Plan, including, but not limited to, the Insurance and Pension Committee.

as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*

## JURISDICTION AND VENUE

2.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a).

3.    Venue here is proper inasmuch as this District is where the Defendant Northwell Health Pension Plan f/k/a Northwell Health Cash Balance Plan f/k/a North Shore-Long Island Jewish Health System Cash Balance Plan f/k/a North Shore University Hospital Pension Plan is administered, where some or all of the alleged breaches took place, where all Defendants may be found, and where many known Defendants reside. *See* 29 U.S.C. § 1132(e).

## THE PARTIES

*Defendants*

4.    Defendant Northwell Health Pension Plan f/k/a Northwell Health Cash Balance Plan f/k/a North Shore-Long Island Jewish Health System Cash Balance Plan f/k/a North Shore University Hospital Pension Plan (the "Plan") is and was at all relevant times an "employee pension benefit plan," and more specifically a "defined benefit plan," within the meaning of 29 U.S.C. §§ 1002(2)(A) and 1002(35).

5.    Defendant North Shore University Hospital ("NSUH") was the Sponsor, Plan Administrator, and named fiduciary of the Plan within the meaning of 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a), during the Class period until on or about December 31, 2017, and is sued in each of these capacities.

6.    Additionally, effective October 1997, the North Shore Health System ("NSHS") (including NSUH) merged with Long Island Jewish Medical Center to form the North Shore-Long

Island Jewish Health System ("NS-LIJHS") merger whereby NS-LIJHS became jointly and severally liable for NSUH's liabilities, along with NSUH itself.

7.      After the merger of NSUH and Long Island Jewish Medical Center, effective January 1, 1999, the North Shore University Hospital Pension Plan was amended and restated to reflect the merger and was converted to a cash balance plan and became known as the North Shore-Long Island Jewish Health System Cash Balance Plan.

8.      Effective in 2016, NS-LIJHS rebranded and changed its name to Northwell Health, Inc. ("Northwell"). This name change had no relevant legal affect other than continuing NS-LIJHS's (and NSUH and NSHS's) liabilities under a different name.

9.      In addition to changing the system's name, the North Shore-Long Island Jewish Health System Cash Balance Plan changed its name to the Northwell Health Cash Balance Plan effective January 1, 2016. This name change had no relevant legal affect other than continuing North Shore-Long Island Jewish Health System Cash Balance Plan's liabilities under a new name, Northwell Health Cash Balance Plan.

10.     Effective at the close of business on December 30, 2022, the Northwell Health Cash Balance Plan was renamed the Northwell Health Pension Plan. This name change had no relevant legal affect other than continuing Northwell Health Cash Balance Plan's liabilities under a new name, Northwell Health Pension Plan.

11.     Defendant Northwell is a corporation registered under the laws of New York, with its headquarters and principal place of business located in Nassau County, New York. Northwell is New York's largest private employer and health care provider, with approximately 21 hospitals and about 900 outpatient facilities, serving the New York City, Long Island, and Westchester

areas.

12.    Since on or about January 1, 2018, Defendant Northwell has been the Sponsor, Plan Administrator, and a named fiduciary of the Plan, within the meaning of 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a), and is sued in each of these capacities.

13.    Defendant Pension Committee ("Committee") is a named fiduciary of the Plan, within the meaning of 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a) and is jointly and severally liable as such.

14.    In the alternative, if the "Pension Committee" is not the name of the committee or entity that had the authority to oversee the actions of the Plan Administrator; interpret and construe the provisions of the Cash Balance Plan; and/or be responsible for implementing any legally required requirements that affect the Cash Balance Plan, including its calculation and payment of benefits, then ABC Committee 1-20 is a pseudonym for that entity(ies) until the identity of such entity(ies) can be determined.

15.    Since the Committee was appointed by NSUH and Northwell, NSUH and Northwell are liable for fiduciary breaches by the Committee.

16.    The Plan acts partly through the Plan Administrator and partly through the Committee, which oversees the Plan Administrator.

17.    For example, if a Plan participant disputes a determination by the Plan Administrator, the participant has the right to have the Pension Committee review and reconsider its claim and the Pension Committee has complete authority and discretion to interpret and construe the provisions of the Cash Balance Plan.

18.    As such, the Committee is responsible for implementing any corrections required

of the Plan as a result of this litigation (for example, due to a reformation of the Plan terms).

19. As a named fiduciary of the Plan, the Committee is "liable for a breach of fiduciary responsibility of another fiduciary" particularly if the Committee failed to make "reasonable efforts under the circumstances to remedy the breach" (for example, correcting employee communications or insuring that benefit payments were consistent with the employee communications). 29 U.S.C. § 1105.

20. Because NSUH and Northwell had a fiduciary responsibility to oversee the Pension Committee, NSUH, and Northwell are each jointly and severally liable with the other for any relief required in this action.

21. ABC Pension Committees 1-20 are fictitious committees, the true names of which are not currently known but may have participated in the acts alleged.

22. A reference to one Defendant should be construed as a reference to the other Defendants, and applies equally to the Defendants' predecessors, successors, subsidiaries or affiliates, participating employers, current and former directors, officers, employees, agents, attorneys, fiduciaries and/or service providers.

### Named Plaintiffs

23. Named Plaintiff William Lorusso was employed in various positions, including Physician Assistant and Senior Physician Assistant at one or more of the Plan's adopting employers, or their predecessors, for approximately 36 years, from 1988 through 2024.

24. At all relevant times during his employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff William Lorusso was a Participant in the Plan.

25.     Named Plaintiff William Lorusso was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because he has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

26.     Named Plaintiff William Lorusso was a participant in the Plan on January 1, 1999, and was both actively employed and a participant in the Plan after January 1, 1999.

27.     Named Plaintiff Margaret Gurlides was employed in various positions, including Dietary Aid, Supervisor of Food Service, Production Manager, Assistant Director of Food and Nutrition, and Senior Manager of Food and Nutrition at one or more of the Plan's adopting employers, or their predecessors, for approximately 43 years, from 1980 through 2023.

28.     At all relevant times during her employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Margaret Gurlides was a participant in the Plan.

29.     Named Plaintiff Margaret Gurlides was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because she has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

30.     Named Plaintiff Margaret Gurlides was a participant in the Plan on January 1, 1999, and was both actively employed and a participant in the Plan after January 1, 1999.

31.     Named Plaintiff Linda Moriarty was employed as a Registered Nurse at one or more of the Plan's adopting employers, or their predecessors, for approximately 28 years, from 1992 through 2020.

32.     At all relevant times during her employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Linda Moriarty was a

participant in the Plan.

33.    Named Plaintiff Linda Moriarty was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because she has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

34.    Named Plaintiff Linda Moriarty was a participant in the Plan on January 1, 1999, and was both actively employed and a participant in the Plan after January 1, 1999.

35.    Named Plaintiff Richard Seaberg was employed in various positions, including Medical Technologist, Lab Supervisor, Lab Section Manager, Project Coordinator, Assistant Administrative Director of Laboratories, Administrative Director of Laboratories, Senior Administrative Director of Laboratory Medicine, Director of Business Services for Laboratory Medicine, and Director of Business Services/Senior Administrative Director at one or more the Plan's adopting employers, or their predecessors, for approximately 45 years, from 1978 through February 2021, and then from April 2021 through February 2024.

36.    At all relevant times during his employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Richard Seaberg was a participant in the Plan.

37.    Named Plaintiff Richard Seaberg was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because he has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

38.    Named Plaintiff Richard Seaberg was a participant in the Plan on January 1, 1999, and was both actively employed and a participant in the Plan after January 1, 1999.

39.    Named Plaintiff Gary Leonard was employed as a Biller, Assistant Director of

Purchasing, Director of Purchasing, and Vice President of Purchasing at one or more of the Plan's adopting employers, or their predecessors, for approximately 33 years, from 1974 through 2007.

40.    At all relevant times during his employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Gary Leonard was a participant in the Plan.

41.    Named Plaintiff Gary Leonard was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because he has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

42.    Named Plaintiff Gary Leonard was a participant in the Plan on January 1, 1999, and was both actively employed and a participant in the Plan after January 1, 1999.

43.    Named Plaintiff Carol Vorperian was employed in various positions, including Assistant Director of Nutrition and Food Service and Director of Nutrition and Food Service at one or more of the Plan's adopting employers, or their predecessors, for approximately 23 years, from 1990 through 2013.

44.    At all relevant times during her employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Carol Vorperian was a participant in the Plan.

45.    Named Plaintiff Carol Vorperian was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because she has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

46.    Named Plaintiff Carol Vorperian was a participant in the Plan on January 1, 1999, and was both actively employed and a participant in the Plan after January 1, 1999.

47.    Named Plaintiff Nicholas Campagnola was employed as a Physical Therapist, Physical Therapist Supervisor, and Physical Therapist Manager at one or more of the Plan's adopting employers, or their predecessors, for approximately 39 years, from 1978 through 2017.

48.    At all relevant times during his employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Nicholas Campagnola was a participant in the Plan.

49.    Named Plaintiff Nicholas Campagnola was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because he has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

50.    Named Plaintiff Nicholas Campagnola was a participant in the Plan on January 1, 1999, and was both actively employed and a participant in the Plan after January 1, 1999.

51.    Named Plaintiff Jerold Scherer was employed in various positions, including Mechanic, Electrician, Assistant Director of Engineering, Director of Engineering and Safety, Director of Facilities, Senior Administrative Director of Facilities, and Associate Executive Director, Support Services at one or more of the Plan's adopting employers, or their predecessors, for approximately 40 years, from 1981 through 2021.

52.    At all relevant times during his employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Jerold Scherer was a participant in the Plan.

53.    Named Plaintiff Jerold Scherer was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because he has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

54. Named Plaintiff Jerold Scherer was a participant in the Plan on January 1, 1999, and was both actively employed and a participant in the Plan after January 1, 1999.

55. Named Plaintiff Denise Bevilacqua was employed in various positions, including Registered Dietician, Operations Analyst, and Senior Patient and Customer Experience Specialist at one or more of the Plan's adopting employers, or their predecessors, for approximately 27 years, from 1988 through 2006, and then from 2013 through 2022.

56. At all relevant times during her employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Denise Bevilacqua was a participant in the Plan.

57. Named Plaintiff Denise Bevilacqua was, and is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7), because she has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

58. Named Plaintiff Denise Bevilacqua was a participant in the Plan on January 1, 1999, and was both actively employed and a participant in the Plan after January 1, 1999.

59. Named Plaintiff Karen Cervantes was employed in various positions, including Clerk Typist, Associate Administrative Support, and Medical Secretary at one or more of the Plan's adopting employers, or their predecessors, for approximately 28 years, from 1995 through 2023.

60. At all relevant times during her employment at one or more of the Plan's adopting employers, or their predecessors, prior to January 1, 1999, Named Plaintiff Karen Cervantes was a participant in the Plan.

61. Named Plaintiff Karen Cervantes was, and is a participant in the Plan, within the

meaning of 29 U.S.C. § 1002(7), because she has a claim to vested benefits under the explicit terms of the Plan, as well as an entitlement to Plan benefits as required by law.

62.     Named Plaintiff Karen Cervantes was a participant in the Plan on January 1, 1999, and was both actively employed and a participant in the Plan after January 1, 1999.

## STATEMENT OF FACTS

### *Relevant Employer and Plan History*

63.     North Shore Hospital opened in 1953.

64.     North Shore Hospital was transformed into a teaching hospital when it joined with Cornell University in 1969, and its name was changed to North Shore University Hospital.

65.     Defendant NSUH adopted the Pension Plan for Employees of North Shore University Hospital ("Pension Plan of NSUH") effective as of January 1, 1966.

66.     In the 1990s, NSUH began to acquire and merge with financially troubled hospitals in the Long Island area. The first hospital to be acquired by NSUH was the Community Hospital at Glen Cove in 1990. Together the two hospitals formed the North Shore Regional Health Services Corporation, which was soon thereafter renamed the NSHS.

67.     Effective as of January 1, 1993, the Retirement Plan for Employees of North Shore University Hospital at Glen Cove ("Glen Cove Legacy Plan") was merged into the Pension Plan of NSUH and the Pension Plan of NSUH became known as the Pension Plan for Employees of North Shore University Hospital/Past Service Plan for Employees of North Shore University Hospital at Glen Cove ("Pension Plan for Employees of NSUH/Past Service Plan for Employees of NSUH at Glen Cove").

68.     Among other things, the merger meant that:

- 11 -

a. If an individual was a participant in the Glen Cove Legacy Plan on December 31, 1990, they automatically became a participant in the Pension Plan of NSUH on January 1, 1991.

b. The Pension Plan of NSUH now stood in the same position legally as the Glen Cove Legacy Plan.

c. The Pension Plan of NSUH took on the assets and liabilities (including both the payment liabilities and the legal liabilities) of the Glen Cove Legacy Plan.

69.    In 1994, Central General Hospital was renamed Plainview Hospital and joined the NSHS.

70.    Effective as of December 31, 1995, the Central General Hospital Retirement Income Plan ("Central General Legacy Plan") was merged into the Pension Plan for Employees of NSUH/Past Service Plan for Employees of NSUH at Glen Cove and the Pension Plan for Employees of NSUH/Past Service Plan for Employees of NSUH at Glen Cove became known as the North Shore University Hospital Pension Plan ("NSUH Pension Plan").

71.    Among other things, the merger meant that:

a. If an individual was a participant in the Central General Legacy Plan on January 1, 1995, and had completed a year of eligibility service as of that date, they automatically became a participant in the NSUH Pension Plan on January 1, 1995.

b. The NSUH Pension Plan now stood in the same position legally as the Central General Legacy Plan.

c. The NSUH Pension Plan took on the assets and liabilities (including both the payment liabilities and the legal liabilities) of the Central General Legacy Plan.

72.    In 1995, Syosset Hospital joined the NSHS.

73.    Also in 1995, LaGuardia Hospital was acquired by the NSHS and was renamed Forest Hills Hospital.

74.    Effective October 1997, the NSHS merged with the Long Island Jewish Medical

- 12 -

Center ("LIJMC") and became known as the NS-LIJHS. Effective as of November 1, 1998, the North Shore University Hospital at Forest Hills Pension Plan ("Forest Hills Legacy Plan") and the North Shore University Hospital at Syosset Pension Plan ("Syosset Legacy Plan") were merged into the NSUH Pension Plan.

75.     Effective as of January 1, 1999, the NSUH Pension Plan was amended (the "Amendment") and restated to reflect the merger of the NSHS with the LIJMC and was also converted to a cash balance defined benefit plan, with the NSUH Pension Plan becoming known as the North Shore-Long Island Jewish Health System Cash Balance Plan ("Cash Balance Plan").

76.     Effective in 2016, the NS-LIJHS was rebranded and changed its name to Northwell Health, Inc.

77.     Effective as of January 1, 2016, the North Shore-Long Island Jewish Health System Cash Balance Plan was renamed the Northwell Health Cash Balance Plan.

78.     Effective as of midnight on December 31, 2017, the sponsorship of the Northwell Health Cash Balance Plan was transferred from NSUH to Northwell Health, Inc.

79.     Effective at the close of business on December 30, 2022, the Northwell Health Cash Balance Plan was renamed the Northwell Health Pension Plan.

### The Pre-Amendment Benefit Formula

80.     Prior to the conversion date of January 1, 1999 (the "Amendment Effective Date" or "Date of Conversion"), Named Plaintiffs and Class Members participated in one or more of the Legacy Plans: NSUH Pension Plan; Central General Legacy Plan; Glen Cove Legacy Plan; Forest Hills Legacy Plan; or Syosset Legacy Plan, all of which had Traditional Benefits Formulas.

81.     A "Traditional Benefit Formula" (as contrasted with a "Cash Balance Formula") expresses the benefit in the form of an annuity, commencing at normal retirement.

82.     In a Traditional Benefit Formula, the benefit earned each year (based upon the service and compensation) provides a similar benefit in the form of an annuity at retirement.  For example, all participants with between 31 and 40 years of service earn an annuity benefit, payable at normal retirement, equal to 1.5% of Basic Compensation (as defined in the Plan) earned during the year.

83.     In a Traditional Benefit Formula, by its nature, all other things being equal, the value (as of the year earned) of the benefit earned in later years is higher than the value of the benefit earned in earlier years due to compensation normally being higher in later years and due to the closer proximity to normal retirement (*i.e.* a smaller interest discount due to the higher age).

84.     Prior to January 1, 1999, each Named Plaintiff (and other members of the Class) accrued benefits under one or more of the Legacy Plans' Traditional Defined Benefit Formulas, which determined Plan benefits according to formulas which included using an employee's compensation and service in the determination of the Plan benefit.

85.     For example, the NSUH Pension Plan, prior to the Amendment (the "Prior Plan Formula"), generally provided for a monthly pension benefit, commencing at normal retirement age (age 65), equal to sum of:

(1)  for years in which an individual has 30 or less years of credited service:

    (A) for years of credited service before 1/1/76:

        (i) 1 ½% of basic compensation for 1975 (up to $14,100), plus

        (ii) 2% of excess compensation for 1975, times

(iii) years of credited service before 1976; plus

(B) for each year of credited service between 1/1/76 and 12/31/88:

(i) 1 ½% of that year's basic compensation, plus

(ii) 2% of that year's excess compensation; plus

(C) for each year of credited service after 12/31/88:

(i) 1 ½% of that year's basic compensation up to the lesser of: (a) 150% of Social Security covered compensation or (b) the Social Security taxable wage base, plus

(ii) 2% of that's year's compensation in excess of the lesser of: (a) 150% of Social Security covered compensation, or (b) the Social Security taxable wage base; and

(2) for individuals that have between 31 and 40 years of credited service: 1 ½% of that year's basic compensation for each year of credited service between 31 and 40 years of credited service ("Legacy Formula").

86. For illustration, as explained to participants in the Summary Plan Description ("SPD"):

1.  **The following calculation applies for your first 30 Years of Credited Service:**

    (A) For Years of Credited Service Before January 1, 1976

         (i)  1-1/2% of Basic Compensation for 1975 (up to $14,100) *plus*

         (ii)  2% of Excess Compensation for 1975 *times*

         (iii)  Years of Credited Service before 1976

    (B) For Years of Credited Service Between January 1, 1976 and December 31, 1988

         (i)  1-1/2% of Basic Compensation *plus*

         (ii)  2% of Excess Compensation

    (C) For Years of Credited Service Between January 1, 1988 and December 31, 1998

         (i)  1-1/2% of Basic Compensation up to the lesser of:

             (a)  150% of your Social Security Covered Compensation, or

             (b)  the Social Security Taxable Wage Base *plus*

         (ii)  2% of Compensation in excess of the lesser of:

             (a)  150% of your Social Security Covered Compensation, or

             (b)  the Social Security Taxable Wage Base.

    PLUS

2.  **The following calculation applies to your 31st through your 40th Year of Credited Service:**

    1-1/2% of Basic Compensation for each Year of Credited Service between 31 and 40 Years of Credited Service.

87.  The SPD illustrates the calculation of the benefit for a sample participant (Joan) as follows:

For Credited Service
Before 1/1/76

Basic Compensation in 1975
$14,100 x 1 ½% = $212 x 6 years = $1,272

Excess Compensation in 1975
$3,900 x 2% = $78 x 6 years =       $ 468
                                    $1,740

PLUS

For Credited Service
between 1/1/76 and 12/31/98

| Year | Total Comp. | Basic Comp. | Excess Comp. | 1-1/2% of Basic Comp. | 2% of Excess Comp. | Total |
|------|------|------|------|------|------|------|
| 1976 | $19,000 | $15,300 | $ 3,700 | $ 230 | $74 | $304 |
| 1977 | 20,000 | 16,500 | 3,500 | 248 | 70 | 318 |
| 1978 | 21,000 | 17,700 | 3,300 | 266 | 66 | 332 |
| 1979 | 22,000 | 22,000 | 0 | 330 | 0 | 330 |
| 1980 | 23,000 | 23,000 | 0 | 345 | 0 | 345 |
| 1981 | 24,000 | 24,000 | 0 | 360 | 0 | 360 |
| 1982 | 25,000 | 25,000 | 0 | 375 | 0 | 375 |
| 1983 | 26,000 | 26,000 | 0 | 390 | 0 | 390 |
| 1984 | 27,000 | 27,000 | 0 | 405 | 0 | 405 |
| 1985 | 28,000 | 28,000 | 0 | 420 | 0 | 420 |
| 1986 | 29,000 | 29,000 | 0 | 435 | 0 | 435 |
| 1987 | 30,000 | 30,000 | 0 | 450 | 0 | 450 |
| 1988 | 31,000 | 31,000 | 0 | 465 | 0 | 465 |
| 1989 | 32,000 | 32,000· | 0 | 480 | 0 | 480 |
| 1990 | 33,000 | 33,000· | 0 | 495 | 0 | 495 |
| 1991 | 34,000 | 34,000· | 0 | 510 | 0 | 510 |
| 1992 | 35,000 | 35,000· | 0 | 525 | 0 | 525 |
| 1993 | 36,000 | 36,000˙ | 0 | 540 | 0 | 540 |
| 1994 | 37,000 | 37,000· | 0 | 555 | 0 | 555 |
| 1995 | 38,000 | 38,000- | 0 | 570 | 0 | 570 |
| 1996 | 39,000 | 39,000· | 0 | 585 | 0 | 585 |
| 1997 | 40,000 | 40,000· | 0 | 600 | 0 | 600 |
| 1998 | 41,000 | 41,000· | 0 | 615 | 0 | 615 |
| TOTAL | | | | $10,194 | $210 | $10,404 |

12/31/98 Accrued Benefit = $ 1,740      (For service before 1/1/76)
                            10,404      (For service between 1/1/76 and 12/31/98)
                           $12,144      per year

1/12 x $12,144 = $1,012 per month

88.    The Prior Plan Formula generally further provided that a participant could elect to have their benefit commence prior to age 65 if they were at least age 55 with at least 10 years of credited service.

89.    Further, if the participant had at least 25 years of credited service and was either

- 17 -

at least age 62 or their combined total of complete years of age and years of service was at least 80 and payment is deferred until age 62, then the Early Retirement Benefit was not reduced for payment prior to age 65, *i.e.*, a "Fully Subsidized Early Retirement Benefit."

90.    A participant with 25 years of credited service could be as young as age 55 and have a combined total of complete years of age and years of service be at least 80, so they could terminate at age 55 and still be eligible for the Fully Subsidized Early Retirement Benefit, although they would have to wait until age 62 to receive the unreduced benefit.

91.    If the participant is not eligible for the Fully Subsidized Early Retirement Benefit, then the Early Retirement Benefit was reduced by 1/15th for each of the first 5 years, and 1/30th for each of the next 5 years that the benefit commencement date preceded age 65.

*Events Leading up to the Amendment*

92.    As discussed above, the NSHS merged with the LIJMC and became known as the NS-LIJHS.

93.    Within three years following the merger, the combined NS-LIJHS had an annual budget of $2.8 billion, 30,000 employees, 700 staff physicians, 7,000 attending physicians and 5,671 beds, making them at the time, the eighth-largest not-for-profit health-care system in the country.

94.    The NS-LIJHS lost nearly $50 million in 1998 and $17 million in 1999.

95.    One way the NS-LIJHS could save a substantial amount of money was by reducing the amount of money it contributed to its pension plan, a decision it had the unilateral right to make for its non-unionized workforce.

96.    Since the amount of money required to be contributed to a pension plan (interest

adjusted over time) is tied directly to the amount of benefits paid, NS-LIJHS (at the time, but when NSUH was the Plan Sponsor, Administrator, and named fiduciary) could lower pension plan costs by lowering benefits.

97.     In fact, the only long-term way to lower pension costs is to lower pension benefits. To say that differently, the sum of the contributions to the plan must equal the sum of the benefits paid, reduced by the interest earned on the funds in the pension trust, because there is no other source of funds to pay the benefits, meaning higher benefits require higher contributions and lower benefits require lower contributions.

98.     One way to cut pension benefits that was used in the 1980-90s, without getting push back about a benefit cut from employees, was to hide the cut in benefits in a conversion from a more Traditional Benefit Formula to a cash balance plan formula.

99.     As discussed below, based on multiple factors, this could result in cost savings to the employer, over time, in the range of 20%-30%, and in some cases much more.

100.    The "savings" to the employer, however, corresponded directly to "losses" in benefits in the same amount (adjusted by the actual return on investments) by the employees.

101.    Based upon information and belief, the Amendment was made by NSUH as a cost savings and/or cost containment measure.

102.    Whether or not the Amendment was done by NSUH as a cost savings measure, the result of the Amendment was to lower costs.

103.    Based upon information and belief, Defendants knew, when the Amendment was made, that it would very likely lead to benefit reductions for many, if not most, Plan participants.

104.    Whether or not Defendants were aware, at the time the Amendment was made,

that it would very likely lead to benefit reductions, the Amendment did, in fact, lead to benefit reductions for many, if not most, Plan participants.

105.    Unless an employer is looking out for its employees' best interest, which is not required while functioning under its settlor capacity, it has no incentive to tell the employees how much benefit they are losing because of a conversion to a cash balance plan (or any other plan amendment).

106.    To the contrary, the employer's interest is to make the change sound as beneficial as possible so as to avoid employee resentment as a result of the plan change.

107.    One of ERISA's core functions is to require that those involved in administering an employer's retirement plans (*i.e.*, acting in a fiduciary capacity) look out for the best interests of the plan participants, including keeping the participants advised about the impact of any significant changes in the plan.

108.    That legal fiduciary duty, though, is often in tension with the employer's interest, including as a settlor.

109.    For example, as described above, the employer who would want to cut its benefits and contributions, would whenever possible, keep the employees in the dark about their lost benefits.

110.    This case illustrates the decision Defendants made when confronted with the legal requirement of transparency and their own strong self-interest to hide the fact it was making substantial cuts to employees' benefits.

111.    As described below, Defendants ultimately chose secrecy and self-interest over transparency and the law, misleading participants so as to keep the potential adverse impact

hidden.

112.     In addition to any incentive to lower costs, NSUH was faced with the reality, in 1998, that years of lowering interest rates and lowering rates of return had led to higher costs.

113.     As stated above, since the cost of the plan is the sum of the benefit payments, reduced by the interest earned on funds in the plan, if the interest earned decreased that meant that a smaller portion of the cost of the benefit payments would come from interest earnings, meaning that more of the cost of the benefits had to be covered by employer contributions.

114.     One solution to costs increasing as interest rates declined was to transfer the risk of declining interest rates to plan participants, *i.e.* that if interest rates declined, so did the plan benefits.  In other words, shifting the risk of lower interest rates from the Plan to the Plan participants represented a cost containment measure.

115.     As an illustration, the monthly 30-year treasury rate (which was required, at the time the Amendment was made, to be used to determine the minimum lump sum benefit attributable to a monthly benefit) declined from a high of 14.68% in October 1981, to 11.75% in January 1984, to 8.93% in January 1989, to 6.29% in January 1994, to 5.16% in January 1999 when the Amendment was effective.

### *The Plan Amendment*

116.     Effective January 1, 1999, the Plan was amended from the Prior Plan Formula to a Cash Balance Plan which now utilized a cash balanced formula (the "Cash Balance Formula").

117.     Here, for those individuals that were active participants in the NSUH Pension Plan as of December 31, 1998, with an accrued benefit under the NSUH Pension Plan that were still active participants as of January 1, 1999, the Amendment provided an "Opening Account

- 21 -

Balance" which froze accruals under the Prior Benefit Formula as of January 1, 1999, and then opened new hypothetical or notional account balance accounts (the "Cash Balance Account") with an Opening Account Balance for each participant in an amount that allegedly "was determined by converting" the participant's "December 31, 1998 accrued benefit under the NSUH Pension Plan benefit formula to its present value on January 1, 1999."

118.     An employee communication describing the "Special Provisions Affecting Former Participants of the North Shore University Hospital Pension Plan" is in the SPD provided to participants.

119.     It was (mis)represented to participants by Defendants (regarding the determination of the amount of the Opening Account Balance) in the SPD that "[t]his conversion method assures that you receive a starting **value** in the Cash Balance Plan which is 'actuarially equivalent' to the **value** of the benefit you had accrued under the North Shore Pension Plan's benefit formula assuming that you retire at age 65." (emphasis added).

120.     Under the Cash Balance Formula, "Pay Based Credits" were and are credited to the Cash Balance Account at the end of the first pay period in March, June, September and December, then, again on December 31, according to a schedule set forth in the Plan document.

121.     Under the Cash Balance Formula, Interest Credits were and are credited to the Cash Balance Account at the end of the first pay period in March, June, September and December, then, again on December 31, based on the Cash Balance Account balance at the end of the previous period. The Interest Crediting Rate is based on the average yields of 30-year U.S. Treasury Bonds during the months of September, October and November of the prior Plan Year.

122.     Under 29 U.S.C. § 1054(g), benefits cannot decline due to a plan amendment

below the already earned benefit.

123.    The protection accorded by 29 U.S.C. § 1054(g) applies not only to the accrued benefit as of the effective date of the plan amendment (the "Protected Benefit") but the related benefits that would be available if the benefit was paid to the participant at an age other than Normal Retirement, or in a form, other than a life only annuity, in particular, if the benefit is paid as a lump sum, the value of the lump sum cannot be less than what the lump sum value of the Protected Benefit would have been, under the terms of the plan prior to the amendment (but adjusted for any changes required/allowed by law) ("Protected Minimum Lump Sum").

124.    As was legally required, the Amendment provided that the actual benefit paid could not be less than the lump sum value of the Protected Benefit (including the value of the protected Fully Subsidized Early Retirement Benefit, if the participant was eligible for the Fully Subsidized Early Retirement Benefit).

125.    Under the Amendment, a participant can only receive their benefit prior to age 65 if the participant has at least 10 years of service and is over age 55 at termination, unless the present value of their accrued benefit is under $5,000, in which case the benefit is paid as a lump sum as soon as administratively feasible.

126.    Under the Amendment, a participant can only elect to receive their benefit in the form of a lump sum prior to age 65 if either 1) the participant has at least 25 years of service and receives the payment no earlier than age 62 or 2) the present value of the accrued benefit is less than $10,000.

### The Wear-Away Effect, i.e., No Increase in Benefit for a Period of Time

127.    Within the benefits industry, "wear-away" describes the period when any pay and

- 23 -

interest credits earned by a participant would not increase his or her actual benefits, but merely reduce the gap between the value of the participant's Cash Balance Account and the participant's old benefits.

128.     That means that if the value (at the time of payment) of a participant's Opening Account Balance (increased with Interest Credits to the payment date) is less than the Protected Minimum Lump Sum, the participant will have received no value for Pay Based Credits "earned" during the wear-away period, even after the Cash Balance Account is no longer less than the Protected Minimum Lump Sum.

129.     In determining each participant's Opening Account Balance under the Cash Balance Formula, Defendants undervalued the "value" of each participant's accrued benefit, as of December 31, 1998, by:

a.  Ignoring the value, for those participants who could eventually have 25 years of service prior to age 65, of their right to retire prior to age 65 and receive an unreduced early retirement benefit at age 62 (*i.e.* generally participants hired prior to age 40, without regard to their age on December 31, 1998);

b.  Using an interest rate of 6.00% to discount the value of the accrued benefit at normal retirement age to present value, when the actual interest rate might be, and in fact was, on average, less than 6.00%; and

c.  Using a mortality discount that further reduced Opening Account Balances to reflect the probability that a participant could die before reaching age 65.

130.     The result was that participants' Opening Account Balances were in amounts significantly lower than the amounts required to provide the participants' Protected Benefit – so that in a very real sense, the participants started their participation under the Cash Balance Formula in a hole.

*Impact of Wear-Away on Plan Benefits*

131.     By having an Opening Account Balance less than the value of the Protected Benefit, the participants started in a hole.

132.     Because participants started in a hole, participants subject to the Cash Balance Formula and who had previously accrued a benefit under the Prior Plan Formula experienced no value from the Pay Based Credits "earned" for varying periods of time, lasting until the balances of their Cash Balance Accounts caught up with the already earned value of their Protected Benefit.

133.     This phenomenon, known as "wear-away," refers to any period of time where a plan participant appears to be accruing additional pension benefits, but is really just re-earning the value of the pension benefits that she or he had previously accrued under the prior plan formula.

134.     In this Plan, wear-away was caused by:

1) The failure to reflect the value of the Fully Subsidized Early Retirement Benefit in the Opening Account Balance, creating a deficiency for anyone who would eventually become eligible for the Fully Subsidized Early Retirement Benefit.

2) The use of a mortality discount, when the account did not grow with survivorship.

3) The transfer of the interest rate risk to the Plan participants, when, in fact, interest rates were lower than the interest rate used to establish the Opening Account Balance in all but one year.

135.     Wear-away is not an accident, but rather – until it was outlawed by Congress in 2006 – it was an integral and cost-savings mechanism deliberately built into many cash balance plan conversions.

136.     In this case, all three prongs of the wear-away resulted in savings to NSUH and then ultimately Northwell through lowered benefits (compared to if the Amendment had not

occurred), caused by the Pay Based Credits not actually increasing Plan benefits, but rather simply being participants re-earning the benefit that they already had earned a right to.[2]

***The First Example of the How Defendants Did Not Appropriately Convey to Participants that the Opening Account Balance Understated the Value of the Protected Benefit: the Failure to Reflect Early Retirement in the Opening Account Balance***

137.    The early retirement subsidy in this Plan was a very valuable benefit for participants eligible to receive it.

138.    For example, a participant who was hired at age 30, would have 25 years of service at age 55, and, therefore, would have a combined age plus service of 80, making them eligible for an unreduced benefit at age 62 (even if they terminated between age 55 and age 62).

139.    If a participant had earned a benefit of $1,000 a month (payable at age 65), and was eligible for an unreduced benefit at age 62 (*i.e.* eligible for the Fully Subsidized Early Retirement Benefit), using the same 6% used in determining the Opening Account Balance, the same mortality as used in determining the Opening Account Balance (but reflecting no mortality between age 62 and age 65) when valuing the age 65 benefit, the value of the immediate age 62 benefit would be $137,074 whereas the value of the deferred to age 65 benefit would be only 78% of that, or $107,267.

140.    As shown in the prior paragraph, failing to reflect the value of the Fully Subsidized Early Retirement Benefit results is a 22% understatement of the Opening Account Balance in replacing the Protected Benefit (for any participant eligible for the Fully Subsidized Early Retirement Benefit at age 62).

---

[2]    It is important to keep in mind that the savings were not isolated to the savings from wear-away, but, as discussed below, when discussing the reduction in benefits at retirement, even once a participant had re-earned the otherwise applicable reduction caused by the understatement of the Opening Account Balance, the value of the post January 1, 1999 accruals were significantly reduced in comparison to the benefits that would have been accrued had the Plan not been converted to a Cash Balance Plan.

141. While not all participants are eligible for the Fully Subsidized Early Retirement Benefit, some would only become eligible after age 62, and some would not receive their benefit at the most expensive age (*i.e.* commencement age of age 62), instead choosing to continue in employment beyond initial eligibility for early retirement, the savings to Defendants associated with eliminating this valuable benefit would be significant.

142. Based upon information and belief, NSUH (or its consultants) determined the savings anticipated from removing the early retirement subsidy (although it may not have been in isolation from the other sources of savings).

***The Second Example of the How Defendants Did Not Appropriately Convey to Participants that the Opening Account Balance Understated the Value of the Protected Benefit: Reflecting Mortality Prior to Age 65 in the Opening Account Balance***

143. The use of a pre-retirement mortality discount is often referred to as PRMD.

144. The understatement of the value of the Opening Account Balance through the use of PRMD is dependent upon the individual's age on the Amendment Date, but even though some participants would have significantly less than a 10% savings, the overall savings due to the use of PRMD is still significant.

145. The reason is because the Opening Account Balance was determined using PRMD, but the value of the Minimum Benefit would be prohibited from using PRMD, with the result that even if the participant was not eligible for the Fully Subsidized Early Retirement Benefit and even if the relevant interest rates were at 6%, if a participant terminated on January 2, 1999 (the day after the effective date of the Amendment) and immediately elected to receive a lump sum payment (for example the present value of the Protected Benefit is between $5,000 and $10,000) then the required lump sum payment would exceed the Opening Account Balance by the difference

- 27 -

between value of the Protected Benefit with a PRMD and the value of the Protected Benefit without PRMD.

***The Third Example of the How Defendants Did Not Appropriately Convey to Participants that the Opening Account Balance Understated the Value of the Protected Benefit: the Transfer of the Interest Rate Risk to Plan Participants, when the Interest Rates Fell***

146. The savings associated with transferring the risk of interest rates declining from the Plan to the participant would have been hard to quantify in advance, because it would be unknown in advance whether interest rates would increase or decrease.

147. When the employee communications were sent to participants, Defendants knew that the relevant interest rate was already below 6.00%, as illustrated by the use of 5.15% in employee communications.

148. Interest rates had been steadily declining for almost two decades at the time the Plan was amended.

149. While the savings from transferring the risk of interest rates declining could not be predicted with precision, it would have been imprudent for the Defendants to assume that interest rates would not decline further and in fact jump to levels that would make the imputed 6% rate realistic.

150. In fact, interest rates did decline over the next two decades.

151. The lower interest rates impacted participant benefits in two distinct ways, the first being the growth of the Opening Account Balance and the second being the determination of the value of the Protected Benefit at the time of payment (or, conversely, the conversion of the Cash Balance Account into an annuity).

### *The Impact of Lower Interest Rates Prior to the Age at Benefit Commencement*

152.    The growth in the Opening Account Balance as compared to the determination of the Opening Account Balance creates an interest arbitrage between the 6% used in determining the Opening Account Balance and the actual Interest Crediting Rate at which the Opening Account Balance grows.

153.    In this Plan, while the Interest Crediting Rate was disclosed, the interest rate used to create the Opening Account Balance was not disclosed.

154.    The average Plan participant in this Plan would not understand the consequence of the interest arbitrage created in this Plan, unlike a plan in which both interest rates were disclosed.

155.    As shown in more detail below, the impact of the interest arbitrage, if the average Interest Crediting Rate for a particular Plan participant was 5%, would be the ratio of the growth at 5% interest to the discount at 6%.

156.    Assuming that a participant is age 65 on January 1, 2019, 20 years after the Amendment Effective Date, and that the average Interest Crediting Rate was 5%, ignoring the impact of PRMD, and the age 65 value of the Protected Benefit used to determine the Opening Account Balance was $100,000, then the Opening Account Balance would equal $100,000 / 1.06 ^ 20 (because it was discounted at 6%) or $31,180, but the Opening Account Balance would only grow to an account of $31,180 X 1.05 ^ 20 (because it averaged growing at 5%) or $82,730.

157.    If the actual value of the Opening Account Balance (with Interest Credits), when the benefit is paid at age 65, is $82,730, but the age 65 value used to create the Opening Account Balance is $100,000 (and the interest rate for conversion purposes at age 65 is the same 6% used to

create the Opening Account Balance) that would mean that the Opening Account Balance understated the value of the Protected Benefit by 17% due solely to the difference between the average Interest Crediting Rate and the 6% rate used in the discount from age 65 in determining the Opening Account Balance.

***The Impact of Lower Interest Rates at the time the Benefit is Paid***

158.    If all factors match the factors used to determine the Opening Account Balance, but the interest rate used to determine the factor to convert an annuity into a lump sum declines from the 6% used to create the Opening Account Balance, this could lead to the Opening Account Balance understating the value of the Protected Benefit.

159.    The age 65 factor to convert an annuity into a lump sum based upon 6% interest and the mortality used in determining the Opening Account Balance, as used to determine the Opening Account Balance is 10.64635 (or close to 10.64635).

160.    The age 65 factor to convert an annuity into a lump sum based upon 5% interest (rather than the 6% actually used) and the mortality used in determining the Opening Account Balance is 11.53399 (or close to 11.53399).

161.    Assuming that a participant had a Protected Benefit of $10,000 a year, and the age 65 factor to convert an annuity to a lump sum value used to create the Opening Account Balance is 10.64635, then the Opening Account Balance would be based upon an age 65 value of the Protected Benefit of 10.64635 X $10,000 or $106,464.

162.    Assuming that a participant had a Protected Benefit of $10,000 a year, and the age 65 factor to convert an annuity to a lump sum value is 11.53399, then the age 65 value of the Protected Benefit would be 11.53399 X $10,000 or $115,340.

163.    If the age 65 factor to convert an annuity to a lump sum increases from a factor of 10.64635 used to create the Opening Account Balance to 11.53399 based upon the interest rates at the time of payment, this would mean that the Opening Account Balance would only provide $106,464 / $115,340 or 92% of the actual value of the Protected Benefit.

*Cumulative Potential Effect of Opening Account Balance Understating the Actual Value of the Protected Benefit*

164.    If the Opening Account Balance only provides 78% of the value of the Protected Benefit due to exclusion of the value of the Fully Subsidized Early Retirement Benefit, 90% of the value of the Protected Benefit due to use of PRMD, 83% of the value of the Protected Benefit due to the actual average Interest Crediting Rates being less than 6% and 92% of the value of the Protected Benefit due to the interest rate used to determine the conversion factor at the time of payment being less than 6%, then the Opening Account Balance would only represent 78% X 90% X 83% X 92% or 54% of the actual value of the Protected Benefit.

165.    If the Opening Account Balance only provides 54% of the actual value of the Protected Benefit, this would lead to multiple years of wear-away for longer service employees.

*The Impact of the Opening Account Balance understating the value of the Protected Benefit on Promised Growth in the Benefit*

166.    As explained above, both the employee disclosures in the form of SPDs provided over the years (most notably including the SPD provided when the Plan was amended) and the employee disclosures in the form of benefit statements, were designed to lead participants to believe that the Plan benefit was equal to the Cash Balance Account.

167.    As a result of leading participants to believe that the Plan benefit was equal to the Cash Balance Account, Defendants led participants to believe that growth in the Cash Balance

Account due to Pay Based Credits was a growth in the participant's benefit.

168.    In the SPD provided to participants, Defendants promised that the participant was earning additional benefits in the form of Pay Based Credits when it says:

> As you continue to work for the NS-LIJ Health System as an eligible employee this account is credited with "Pay Based Credits" and "Interest Credits."

and

> Your account is credited with **"Pay Based Credits"** equal to three percent (3%) of Compensation beginning with the quarter following or coincident with your participation date in the Cash Balance Plan.

169.    No caveat is provided regarding the Pay Based Credits that either the Pay Based Credits have no value, or that the Pay Based Credits are not actually increasing a participant's benefit under the Plan.

170.    Nothing was disclosed to participants that would dissuade the average Plan participant from the notion that Pay Based Credits translated directly to the growth in the Plan benefit.

171.    It is not until after participants "wear-away" their Protected Benefits, that these participants would experience a positive pension benefit accrual rate.

172.    Even after the participant is no longer in the wear-away period, the Plan fails to fulfill the promise that all the Pay Based Credits represented growth in the Plan benefit, because the Pay Based Credits received while the participant was in the wear-away period still provided no additional benefit to the participant.

173.    If, when a participant is paid their benefit, the participant's Cash Balance Account is $90,000, but the value of the Protected Benefit is $100,000, then the participant has received

no value for any Pay Based Credits at all.[3]

174.    If, when a participant is paid, the participant's Cash Balance Account is $110,000, the value of the Opening Account Balance (increased with Interest Credits attributable to the Opening Account Balance) is $80,000 and the value of the Protected Benefit is $100,000, then that would mean:

a.    The participant is no longer in wear-away when the participant is paid.

b.    The value of the Pay Based Credits is the difference between the total Cash Balance Account of $110,000 and the value of the Opening Account Balance of $80,000, or $30,000.

c.    The value of the increase in the Plan benefit over the already earned Protected Benefit is the difference between the total Cash Balance Account of $100,000 and the value of the Protected Benefit of $100,000 or $10,000.

d.    That the excess of the value of the Pay Based Credits of $30,000 over the increase in the value the Plan benefit of $10,000, or $20,000 represents the value of the Pay Based Credits that did not actually provide any increase in benefits.

e.    Once the total Cash Balance Account exceeds the value of the Protected Benefit (*i.e.* the participant is out of the wear-away period) the determination of the value of the Pay Based Credits that did not actually increase the Plan benefit is equal to the excess of the value of the Protected Benefit over the value of the Opening Account Balance (with the Opening Account Balance increased with Interest Credits attributable to the Opening Account Balance).

f.    That means that while the level of Pay Based Credits impacts the length of the wear-away period, it has no impact on the value of the Pay Based Credits that did not provide any increase in the Plan benefit.

g.    That means that the Transition Credits have no impact on the value of the Pay Based Credits (including Transition Credits) that provide no increase in Plan benefits.

h.    That means that while the Transition Credits impact the length of the wear-away period, for a participant who exits the wear-away period, the Transition

---

[3]    For simplicity, references to "Pay Based Credits" includes the value of any Transition Credit, except when specifically discussing the Transition Credit.

Credits do not impact the value of the Pay Based Credits (including Transition Credits) that provide no increase in Plan Benefit.

175.    The broken promise that Pay Based Credits were actually increasing Plan benefits, when, in fact, they provided no increase in Plan benefits for some period of time is precisely what occurred here to Named Plaintiffs and the members of the proposed Class and can be demonstrated by reference to the hypothetical individual, Joan, referenced in the SPD, as well as Named Plaintiff Jerold Scherer.

***Illustration of Impact of Wear-Away using Hypothetical Participant Joan***

176.    As mentioned above, the employee communications used a hypothetical participant, Joan, to illustrate certain Plan features.

177.    Per Defendants' SPD,

Joan was a participant in the NSUH Pension Plan with an annual accrued benefit, payable at age 65, of $12,144 determined as of December 31, 1998 . . . . She is age 48 as of January 1, 1999.  Her Opening Account Balance was calculated as follows:

Annual accrued benefit x present value conversion factor = Opening Account Balance.

Age 48 lump sum conversion factor = 3.6163.

$12,144 x 3.6163 = $43,916 (which represents the present value of Joan's benefit accrued to date assuming she starts to
collect benefits at age 65).

178.    The 3.6163 conversion factor was determined as the product of an age 65 factor (determined using 6.00% interest as stated in the Plan terms and mortality using the applicable mortality table) of 10.64635, the probability of survival from age 48 to age 65 (determined using the applicable mortality table) of 0.91467 and a discount for interest at 6.00% (also, as stated in the Plan terms) from age 65 to age 48 (*i.e.* $1/1.06^{(65-48)}$) of 0.37136.

179.    No explanation of how the 3.6163 factor was determined was provided in the

employee communications (beyond the cryptic comment that it is the "Age 48 lump sum conversion factor").

180. With no explanation of how the 3.6163 factor was determined, Plan participants were left to trust the Plan fiduciaries that this factor properly represented the value of Joan's already earned benefit.

181. There is no basis to believe that the average Plan participant could have determined how the 3.6163 factor was determined.

182. There is no basis to believe that the average Plan participant had any understanding of what the 3.6163 factor represented, beyond that it was the factor used in determining the Opening Account Balance.

183. If Joan was 48 on December 31, 1998, then she was born on December 31, 1950. That would mean Joan was 62 on December 31, 2012 and 65 on December 31, 2015.

184. 2000 was the only year prior to Joan turning age 65 in which the Interest Crediting Rate actually equaled or exceeded 6.00%.

185. The average Interest Crediting Rate from 1999 through 2015 was roughly 4.5%.

186. Assuming that the Interest Crediting Rate was a consistent 5.00%, the $43,916 Opening Account Balance would grow to $43,916 X 1.05 ^ (65 – 48) = $100,656 when Joan turned age 65.

187. The age 65 factor to convert the account into an annual annuity, using the same mortality table used in 1999, but at 5.00% interest rate, would be a factor of 11.53399 rather than the 10.64635 factor used to create the Opening Account Balance.

188. Using the 11.53399 conversion factor and an age 65 Cash Balance Account of

$100,656, would produce an annual annuity benefit at age 65 of $8,726.93.

189.     An age 65 annuity benefit of $8,726.93 is only 72% of Joan's December 31, 1998 Protected Benefit of $12,144.

190.     If the Opening Account Balance only produces a benefit of 72% of the already earned benefit, that means that any Pay Based Credits earned after December 31, 1998 do not actually increase Joan's benefit, until such time as the Pay Based Credits are sufficient to cover the additional 28% of Joan's December 31, 1998 benefit that is not provided by her $43,916 Opening Account Balance (with Interest Credits).  To say this differently, the Opening Account Balance did not represent the full value of the benefit that employees had earned for service before 1999.

191.     The SPD further provides that Joan "began participating in the NSUH Pension Plan as of January 1, 1970."

192.     Assuming that Joan began participating in the NSUH Pension Plan on January 1, 1970, and she "continued as an active participant in the NSUH Pension Plan through December 31, 1998", then she had 29 years of service as of December 31, 1998.

193.     Joan would turn 55 on December 31, 2005, with 36 years of service, at which point her age plus service would exceed 80, meaning that Joan would be eligible to receive the $12,144 annual annuity benefit, without reduction when she turned age 62 (*i.e.* she would be eligible for the Fully Subsidized Early Retirement Benefit) on December 31, 2012 (without regard to when between age 55 and age 62 she terminated employment).

194.     The age 62 factor to convert the Cash Balance Account into an annual annuity, using the same mortality table used in 1999, at 5% is 12.45607.

195.     Joan's Opening Account Balance of $43,916 would grow at 5.00% (*i.e.* assuming

that the average Interest Crediting Rate is 5.00%), so that at age 62, her Opening Account Balance would have grown to $43,916 X 1.05 ^ (62 − 48) = $86,951.

196.    Using the conversion factor of 12.45607, the age 62 account of $86,951 attributable to her Opening Account Balance would provide an age 62 annual annuity of $6,981.

197.    $6,981 is only 57% of the $12,144 Protected Benefit that Joan was already entitled to, assuming she remained employed until at least age 55 and received her benefit at age 62.

198.    That means that Joan earned no additional age 62 Plan benefit, until the Pay Based Credits were sufficient to cover the additional 43% of her Protected Benefit that was not provided by her Opening Account Balance.

199.    The benefit shortfall at age 62 of $12,144 - $6,981 = $5,163, which, based upon a conversion factor of 12.45607 would be equivalent to an account of $5,163 X 12.45607 or $64,311.

200.    Defendants' SPD further provides that assuming Joan earns $15,000 a quarter in 1999, and has a Pay Based Credit of 3% of pay plus a Transition Credit of 2.5% of pay, that means her Pay Based Credit for each quarter in 1999 is $825.

201.    Assume that Joan receives a 5% salary increase each year, effective January 1 of that year.  That means that Joan's total account at age 55 (on December 31, 2005), assuming a constant 5.00% Interest Crediting Rate (which was equal to the 30-year treasury rate) and 2.50% Transition Credit, would be roughly $93,325 (the $43,916 Opening Account Balance, which would grow to $61,794 plus the post-1998 Pay Based Credits with interest of $31,531).

202.    Assuming that the interest rate at age 55 is 5%, Joan's age 55 value of her Protected Benefit would be the Protected Benefit of $12,144 X the age 62 factor of 12.45607 / interest

discount factor of 1.05 ^ (62 – 55) = $107,502.[4]

203.    If Joan's age 55 Cash Balance Account value consists of $61,794 attributable to her Opening Account Balance plus $31,531 attributable to her Pay Based Credits and her age 55 value of her Protected Benefit is $107,502, then none of the $31,531 value of her Pay Based Credits actually increased her Plan benefit.

204.    If, as of December 31, 2005, none of Joan's post January 1, 1999 Pay Based Credits actually increased her Plan Benefit, then the promise that her benefit (in the form of her Cash Balance Account) was growing due to the Pay Based Credits was false and misleading.

205.    The analysis shown using an Interest Crediting Rate of 5% and 5% annual pay increases means, it would have been very likely, in 1999, that Joan would have absolutely no increase in her age 55 benefit because the accumulated value of the additional Pay Based Credits and Transition Credits with interest (*e.g.*, $31,531 assuming a 5% 30-year treasury rate and 5% annual pay increases) would be insufficient to cover the portion of her age 55 benefit not covered by her Opening Account Balance (*i.e.* the age 55 value of the Protected Benefit of $12,144, payable commencing at age 62 would be $107,502, which is in excess of the $93,324 Cash Balance Account balance assuming a 30-year treasury rate of 5%).

206.    There can be no dispute that in 1999, Joan would almost certainly have been subject to an extended period of wear-away on her age 55 benefit.

207.    All of the employee communications promised Joan that she would see benefit

---

[4]    In the SPD, as discussed below, Defendants disclose that the Transition Credit is based upon an average annual pay increase of 3% per year.  The lower salary increase rate of 3% would lower the Cash Balance Account balance, with no change in the Protected Benefit, so would actually make the Cash Balance Account fall even further short of the Protected Benefit (although the same would not be true if comparing to the benefit, had the Amendment not occurred, as discussed below).

growth from the Pay Based Credits, but, as the prior paragraphs show, even after 7 years, her benefit could easily have no growth whatsoever.

208. Similarly, there can be no dispute that in 1999, Joan would very likely have been subject to some period of wear-away on her age 65 benefit.

209. There is nothing in the employee communications that would indicate, to an average Plan participant, that even though Joan would have received Pay Based Credits for all the years from 1999 through 2005, that she would have very possibly earned no additional benefit at age 55.

210. It is not reasonable that an average Plan participant could make the leap from the very last paragraph in the SPD saying that the Plan had a Minimum Benefit of "the value of your December 31, 1998 accrued benefit under the former NSUH Pension Plan including the value of any early retirement subsidies for which you may be eligible at the time you commence payment of your benefits" to "you may not be earning any new benefits at all for the next 7 years, despite appearing to earn Pay Based Credits and Transition Credits" (or to say that differently "the Pay Based Credits and Transition Credits you are earning may have no value").

***Analysis of Why Joan Could Have Easily Had No Value From Seven (or More) Years of Pay Based Credits***

211. There are three reasons that Joan's Opening Account Balance falls so far short of providing the full value of her Protected Benefit that multiple years of "growth" through Pay Based Credits (and Transition Credits) could so easily provide no actual increase in her Plan benefit.

212. The first reason is because the benefit was discounted at 6.00% when determining the Opening Account Balance, but assuming that the 30-year treasury rate was a constant 5.00%,

the account only grew at 5.00%. (Recall that as pointed out above, the actual Interest Crediting Rates averaged less than 5.00%.) Thus, Joan's account falls short because of this interest arbitrage.

213.    It would have been clear in late 1998 and in 1999 that there was a very real chance that the 30-year treasury rates could be less than 6.00% because the monthly 30-year treasury rates during all of 1998 were below 6.00% and the December 1998 rate was actually only 5.06%.

214.    In December 1999, when the SPD was provided to Plan participants, Defendants already knew that the 30-year Treasury rate applicable for 1999, *i.e.*, the Interest Crediting Rate for 1999, would be 5.15%. In other words, in 1999, when the SPD was prepared, Defendants knew that there was a very real chance that the 30-year Treasury rate and the Interest Crediting Rate could be significantly less than 6.00%, because it already was.

215.    In contrast, the average Plan participant would not know, based upon the information in the SPD, that the current Interest Crediting Rate in 1999 was less than the interest rate used to determine the Opening Account Balance.

216.    The employee communications never disclosed that the Opening Account Balance was determined using a 6.00% interest rate, so the average Plan participant would have no means to know in 1999 that the current 5.15% Interest Crediting Rate was less than the rate used to create the Opening Account Balance.

217.    The second reason Joan's Opening Account Balance falls short is because the benefit was discounted from age 65 even though, assuming that Joan continued in active service until age 63, and Joan had only 10 years of service as of December 31, 1998 (rather than the 29 she actually had), Joan would have been entitled to her full $12,144 annual benefit, unreduced at age 63.  As we saw, while Joan's Opening Account Balance provided 72% of her age 65 benefit, it only

provided 57% of her age 55 benefit, meaning that the Opening Account Balance necessary to replace the full value of her age 55 benefit was an additional 25% more than the value needed to replace the value of her age 65 benefit.

218.    The third reason Joan's Opening Account Balance falls short is because Joan's Opening Account Balance was reduced by a factor of 0.91467 representing the probability of survival to age 65.  But, as Joan survived each year, her Opening Account Balance was not increased to reflect her survival.  Thus, the Opening Account Balance was reduced by the 0.91467 factor, but with no potential of recovering that reduction.  In other words, even if the Interest Crediting Rate was a constant 6% and Joan took her benefit at age 65, the Opening Account Balance would still only be sufficient to cover 91% of her Protected Benefit.

219.    Defendants therefore knew that because of the way they set up the new cash balance plan, it was probable that a participant's Opening Account Balance would provide a smaller benefit than the amount to which that participant would have been entitled to receive at normal or early retirement age had they earned no additional benefit after December 31, 1998. To say that differently, Defendants knew in 1999, when communicating the Amendment to Plan participants, that the Opening Account Balance was very likely to be insufficient to provide the Protected Benefit, and, as Joan illustrates, potentially falling well short of providing the Protected Benefit to which Joan was entitled.

***Significantly Reduced Benefit Accruals***

220.    In addition to effectively freezing future benefit accruals for periods of time, Defendants' conversion to the Cash Balance Provisions of the amended Plan also significantly reduced the benefits that were available at retirement (assuming continued employment) for

Named Plaintiffs and other members of the proposed Class.

221.    In the SPD, Defendants assured participants that the benefits would not be reduced as a result of the Amendment when it said:

> Note: Transition Credits are designed to provide additional benefits to certain participants who **might otherwise experience a shortfall** in their normal retirement benefits as compared with those benefits they would have received under the former NSUH Pension Plan, **had it continued**. Transition Credits are calculated under a single set of assumptions regarding future interest and salary rate increases, which might be different from actual experience. Therefore, these credits **do not provide a guarantee** that **benefits under the current Retirement Program will meet or exceed those which the former NSUH Pension Plan would have provided**. While the NS-LIJ Health System established certain eligibility criteria for the receipt of Transition Credits, which were intended to **protect the majority of participants from shortfalls** in their **normal retirement benefits as compared with those benefits provided under the former NSUH Pension Plan**, the fact that a **participant is not eligible for Transition Credits, is also not a guarantee that the benefits provided under the current Retirement Program will meet or exceed those that the participant might have received under the former NSUH Pension Plan formula, had it continued**.

 (emphasis added).

222.    The quoted SPD paragraph reference to a "shortfall" is a reference to the "normal retirement benefits" being less than the benefits that would have been provided under the terms of the Plan, had the Amendment not occurred.

223.    The "shortfall" in the quoted paragraph is not, in any way, a reference to the Protected Benefit.

224.    The "shortfall" in the quoted paragraph is not, in any way, a reference to wear-away (because the comparison is to the benefit that would have been provided had the Prior Plan Formula "continued" rather than the benefit earned as of December 31, 1998).

225.    The expression "do not provide a guarantee," without further explanation, would indicate to the average Plan participant that the likelihood of there being a "shortfall" would be

small.

226. If the expression "do not provide a guarantee" was intended to mean that there was no reliability to the comments regarding the "shortfall" that would mean that the comments about the "shortfall" were mere puffery. For example, the statement that "Transition Credits, which were intended to protect the majority of participants from shortfalls in their normal retirement benefits as compared with those benefits provided under the former NSUH Pension Plan" loses any actual substance if the comment "do not provide a guarantee" absolves Defendants from any level of substance regarding whether there will be a "shortfall," resulting in the comment being puffery.

227. Fiduciaries in ERISA plans are not allowed to use puffery in fiduciary communications (because the communications are supposed to be unbiased).

228. If there was a substantial likelihood of there being a "shortfall," and the Plan was disclosed in an unbiased manner, the likelihood of there being a shortfall would have been more prominent than "do not provide a guarantee."

229. The expression "do not provide a guarantee," without further explanation, would indicate to the average Plan participant that if there was a "shortfall" it would not be a significant "shortfall."

230. If there was a substantial likelihood of a significant "shortfall," and the Plan was disclosed in an unbiased manner, the potential magnitude of the "shortfall" would have been disclosed.

231. The expression "**benefits** under the current Retirement Program will meet or exceed those which the former NSUH Pension Plan would have provided" without further

explanation, would indicate to the average Plan participant that there would be no anticipated "shortfall" at any age.

232.   If the expectation was that there would be no "shortfall" if the benefit was received at age 65, but that there would be a shortfall at age 62, and the Plan was disclosed in an unbiased manner, the "shortfall" at age 62 would have been disclosed.

233.   By failing to disclose the "shortfall" at age 62, while claiming that there would be no anticipated shortall in the "benefit" the SPD obscured the impact of the Amendment on the Fully Subsidized Early Retirement Benefit.

234.   The expression that the Transition Credit would "protect the majority of participants from shortfalls" would indicate to the average Plan participant that if the "assumptions" used to determine the Transition Credit were exactly met (which would include participants working until age 65, and then retiring at age 65) then the majority of participants would have no "shortfall."

235.   Even if the actual outcome of events exactly matched the assumption used in determining the Transition Credit, every single Plan participant receiving a Transition Credit would have a "shortfall" in the benefit under the Plan after the Amendment as compared to the benefit the participant would have received under the Prior Plan Formula.

236.   Even if the actual outcome of events exactly matched the assumption used in determining the Transition Credit, every single Plan participant receiving a Transition Credit would have a "shortfall" in the sum of the benefit under the Plan after the Amendment and the benefit under the 403(b) Plan (excluding employee deferrals with interest) as compared to the benefit the participant would have received under the Prior Plan Formula due to how mortality was

applied.[5]

237. The combination of the statement that the Transition Credit is provided to those Plan participants who "might otherwise experience a shortfall" and if a "participant is not eligible for Transition Credits, is also not a guarantee that the" participant will not have a "shortfall" would indicate to the average Plan participant that those participants who did not receive a Transition Credit, that they did not receive a Transition Credit because they most likely would not have a "shortfall."

238. Even if the actual outcome of events exactly matched the assumption used in determining the Transition Credit, most Plan participants not receiving a Transition Credit would have a "shortfall" in the benefit under the Plan after the Amendment as compared to the benefit the participant would have received under the Prior Plan Formula.

239. Even if the actual outcome of events exactly matched the assumption used in determining the Transition Credit, a large percentage of Plan participants not receiving a Transition Credit would have a "shortfall" in the sum of the benefit under the Plan after the Amendment and the benefit under the 403(b) Plan (excluding employee deferrals with interest) as compared to the benefit the participant would have received under the Prior Plan Formula due to how mortality was applied.

***Comparison of Joan's Benefit Under the Prior Plan Formula to Under the Cash Balance Formula***

240. By way of example turning back to the hypothetical individual, Joan, from the SPD, if Joan continued in employment until age 65, she received 5% pay increases each January 1 (after receiving a jump in pay from $41,000 in 1998 to $60,000 in 1999, as shown in the SPD) Joan

---

[5] For simplicity, references to the benefits under the 403(b) Plan, exclude the benefits from employee deferrals and interest on those deferrals.

received no Transition Credit (because, as explained below, Joan would not be eligible for a Transition Credit) and the 30-year treasury rate was a constant 5.00%, her Cash Balance Account would be roughly $123,300 at age 65.  Using the 11.53399 conversion factor, her age 65 annual annuity benefit would be roughly $123,300 / 11.53399 or $10,693.

241.    Under the Prior Plan Formula, her benefit would increase by 1.50% of her basic compensation and 2.00% of her excess compensation until she had 30 years of service.  Since she already had 29 years of service as of December 31, 1998, she would be under this formula for only 1999.  If she earns $15,000 a quarter, that means she would earn $60,000 in 1999.  Assuming that it is all basic compensation, Joan's benefit would grow by 1.50% X $60,000 or $900 for 1999.

242.    Starting in 2000, her 31st year of service, Joan would earn 1.50% of basic compensation.  Assuming that all her compensation is basic compensation, and that her pay increases 5% per year, she would earn an additional $11,886 of benefit at age 65.

243.    The sum of the already accrued annual benefit of $12,144, as of December 31, 1998, plus the 1999 accrual of $900, plus the accrual of $11,886 for years of service 31-40, produces a total benefit under the Prior Plan Formula of $24,930.

244.    If the expected annual benefit under the Prior Plan Formula at age 65 is $24,930 and the expected annual benefit under the Cash Balance Formula is $10,693, this would mean that the Cash Balance Formula produces a lower age 65 benefit than under the Prior Plan Formula.

245.    The reduction in the age 65 benefit is an unsurprising result, especially with salary increases and a lower than 6% 30-year treasury rate.

246.    If Joan had compensation in 1999 of $60,000, had annual pay increases of 5%, Joan deferred 5% of pay into the 403(b) Plan and the 403(b) Plan has an 8% rate of return then Joan's age

65 403(b) account balance would be roughly $118,900.

247.    If Joan's age 65 403(b) account balance is $118,900 and Joan could convert the 403(b) account into an annuity on the same terms as in the Plan, and that factor is the 5% factor of 11.53399, then the 403(b) plan would provide an annual benefit of $118,900 / 11.53399 or $10,312.[6]

248.    That would mean, under these assumptions, that the combination of Joan's Cash Balance Formula benefit of $10,693 and her 403(b) benefit of $11,312 for a total of $21,005 would fall short of her Prior Plan Formula benefit of $24,930.

249.    If, instead, it is assumed that Joan's 1998 compensation of $41,000 remained constant, she would earn a benefit of $615 in 1999 (the same as in 1998) and the same $615 for the 31st through 40th year of service, for a total of 11 years at $615, or $6,765 for years after 1998.

250.    Combining the $12,144 Joan had earned as of December 31, 1998, with the $6,765 she would earn after 1998, her total expected annual benefit at age 65 under the Prior Plan Formula, assuming continued employment, but constant future salary, would be $18,909.

251.    Assuming constant future salary of $41,000, the Pay Based Credit plus Transition Credit of 3% (again, because Joan would not be eligible for a Transition Credit) and a constant Interest Crediting Rate of the 1999 Interest Crediting Rate of 5.15%, Joan would have a Cash Balance Account at age 65 of roughly $135,900.

252.    The age 65 conversion factor, using a 5.15% Interest Crediting Rate and the mortality table used to create the Opening Account Balance, is 11.39269.

---

[6]    If the 403(b) account could be converted to an annuity on more favorable terms than the Cash Balance Account could be converted to an annuity, the Defendants had a fiduciary obligation to inform participants that they could increase their annuity benefit by rolling their Cash Balance Account into the 403(b) plan, and then converting the account into an annuity in the 403(b) Plan.  It is much more likely that the conversion of the 403(b) account into an annuity was on less favorable terms than under the Cash Balance Formula, which means that this analysis overstates the annuity available from the 403(b) plan.

253.     Using an age 65 Cash Balance Account of roughly $135,900 and a conversion factor of 11.39269, the Cash Balance Formula benefit at age 65 would be an annual annuity of $11,933.

254.     If the Prior Plan Formula age 65 annual benefit for Joan would be $18,909 and the Cash Balance Formula age 65 annual benefit for Joan would be $11,933, then the Amendment represented a potential significant risk of a reduction in Joan's benefit.

***Determination of the Transition Credit***

255.     The SPD explains that the Transition Credit is calculated by first "projecting and comparing the [then NS-LIJHS] provided age 65 retirement benefit under both the former NSUH Pension Plan and under the new Retirement Program."

256.     Mathematically that transition credit starts by determining how much the "new Retirement Program" would fall short from the Prior Formula Benefit.

257.     It would not be clear to the average Plan participant that "new Retirement Program" in the section just quoted refers to the sum of the Cash Balance Formula benefit in the Plan (which the SPD is for) plus the benefits from the 403(b) plan (which is not covered by the SPD, noting that an SPD is for a single plan, so while there is also an SPD for the 403(b) plan, it is a separate SPD). To say that differently, it would not be clear that when the SPD is discussing a "shortfall," it is not discussing a potential reduction in benefits in this Plan (as would be required for a proper 204(h) notice, as discussed below) but rather is discussing a potential reduction in benefits when combined with the employer provided benefits provided in the 403(b) plan, including assumed matches that the employee may not actually be receiving.

258.     There are substantial differences in how the benefits are provided under the 403(b) plan and this Plan, for example, in the 403(b) plan, while a participant may average a higher rate of

return than the Interest Crediting Rate, they are also exposed to the possibility of negative returns (such as in 2008) while the Interest Crediting Rate would never be negative.

259.    Also, the conversion of the 403(b) benefit to an annuity would be subjected to market rates, whereas the Cash Balance Plan would be converted based upon the 30-year Treasury rate, which is generally slightly more favorable than market rates.

260.    The determination of the Transition Credit is very complex, which is most likely why, even though the SPD shows much (but not all) details of the calculations regarding Joan, it simply assumes that "her Transition Credit percentage was 2.5%."

261.    The determination of Joan's Transition Credit is shown in the following paragraphs.

262.    Joan's 1998 Pensionable Compensation is $41,000.

263.    If Joan's pay increases 3% per year (for example, the 1999 Pensionable Compensation is $42,230), and Joan continues in employment until age 65, then her age 65 benefit under the Prior Benefit Formula would be $20,255.

264.    A benefit at age 65 of $20,255 would be equivalent to a lump sum at age 65, determined using 6% interest and 1999 417(e) applicable mortality (leading to the same factor as used to create the Opening Account Balance of 10.64635) of $20,255 X 10.64635 = $215,642.

265.    The age 65 Cash Balance Account, using the Opening Account Balance of $43,916, Pensionable earnings of $41,000, increasing 3% per year starting in 1999, no Transition Credit and 6% interest would be $163,148.

266.    Assuming a deferral of 5% of pay in the 403(b) plan, a match of 33.3% of the deferral (which is the match in 1999 in the 403(b) plan) would be a match of 1.665% of pay.

267.    If the match is 1.665% of pay, and there is a basic 403(b) contribution of 3% of pay, the total employer contribution in the 403(b) plan would be 4.665% of pay.

268.    With a 1998 compensation of $41,000, increasing each January 1 by 3%, contributions made semi-monthly of 4.665% of pay, and the account is growing with an interest rate of 8% per annum, the age 65 account balance would be $69,003.

269.    If the Cash Balance Account at age 65, prior to the Transition Credit, is $163,148, the 403(b) account balance at age 65 is $69,003 and the value of the benefit under the Prior Plan Formula is $215,642, then there would be no potential shortfall, under the method used to determine the Transition Credit.

270.    Since Joan would have no potential shortfall, Joan would have no transition credit.

***Communication Regarding Comparison of Prior Plan Formula Benefit to Cash Balance Formula Benefit***

271.    Communicating to a Plan participant (such as Joan) in a SPD that they have no "shortfall" (*i.e.* meet the age and service requirement to be eligible for a Transition Credit, but are not receiving a Transition Credit) communicates that there will not be (or there is no anticipation that there will be) a "shortfall in their normal retirement benefits as compared with those benefits they would have received under the former NSUH Pension Plan, had it continued."

272.    In the SPD, a reference to a "normal retirement benefit" would be a reference to the annuity benefit payable from the Cash Balance Formula at normal retirement date.

273.    If the "normal retirement benefit" is not less than the Prior Formula Benefit, that would mean the benefit **without** the 403(b) benefit has no reduction from the Prior Formula Benefit.

274.    It is not true for most Plan participants that they have no reduction in their normal

retirement benefit (as compared to the benefit under the Prior Plan Formula) as a result of the Amendment.

275.    The Transition Credit is calculated based upon a specified set of assumptions.

276.    In the statement in the SPD that:

Transition Credits are calculated under a single set of assumptions regarding future interest and salary rate increases, which might be different from actual experience. Therefore, these credits do not provide a guarantee that benefits under the current Retirement Program will meet or exceed those which the former NSUH Pension Plan would have provided.

The SPD statement implies that if the assumptions are met, then the "benefits under the current Retirement Program will meet or exceed those which the former NSUH Pension Plan would have provided."

277.    In fact, even if all the assumptions were met, Joan's benefit under Prior Plan Formula would have exceeded the benefits under the Cash Balance Formula, *i.e.* Joan's benefit from the Plan was reduced due to the Amendment.

278.    Further, even if all the assumptions (used to determine the Transition Credit) were met, and the benefits under the 403(b) plan are added to the Cash Balance Formula, Joan's benefit under the Prior Plan Formula would have exceeded the benefits under the combined Cash Balance Formula and 403(b) plan at ages from age 55 through just after age 64 (due to the Fully Subsidized Early Retirement Benefit).

279.    In discussing the transition benefit in the SPD, the failure of the discussion to mention the Fully Subsidized Early Retirement Benefits masks the loss of the substantial value of the Fully Subsidized Early Retirement Benefit as a result of the Amendment.

280.    The failure of the SPD to mention the removal of the valuable Fully Subsidized Early Retirement Benefit hid this benefit reduction from Plan participants.

281. The failure of the SPD to mention the removal of the valuable Fully Subsidized Early Retirement Benefit, while simultaneously claiming that the "Transition Credits are designed to provide additional benefits to certain participants who might otherwise experience a shortfall in their normal retirement benefits as compared with those benefits they would have received under the former NSUH Pension Plan, had it continued" falsely reassured participants that benefits were not being reduced (subject to the stated assumptions being met) due to the Amendment.

282. NSUH (in their settlor capacity) was under no obligation to provide the Transition Credit, and, assuming they decided (as they did) to provide the Transition Credit, they were free to design the Transition Credit in any way they saw fit (subject to rules, such as non-discrimination and backloading, that are not relevant here).

283. Since NSUH (in their settlor capacity) was free to design the Transition Credit as they saw fit, within the design that they selected (which included the use of assumptions in the determination of the Transition Credit) they could select whatever assumptions they saw fit.

284. Defendants (in their fiduciary capacity) had an obligation to communicate the operation of the Plan, including the operation of the Transition Credit in a truthful and unbiased manner.

285. The SPD communicated that if the assumptions used to create the Transition Credit lined up with actual experience, a Plan participant was unlikely to have a "shortfall."

286. In order to meet the requirement that the SPD was truthful and unbiased, when it claims that it would be unlikely for a Plan participant to have a "shortfall," if the assumptions were met, Defendants had an obligation to use assumptions that properly represented experience that could reasonably occur.

287.    It would have been imprudent to believe that the assumptions being used to determine the Transition Credit were likely to be met.

288.    In fact, at the time that the SPD was provided to Plan participants, if Defendants were acting prudently in their dealings with the Class Members, Defendants would have known that the assumptions being used to determine the Transition Credit were very likely more favorable (to the benefits after the Amendment compared to the benefit under the Prior Plan Formula) than what the actual experience would be.

### *Analysis of Named Plaintiff Jerold Scherer*

289.    Named Plaintiff Jerold Scherer is a representative example of the effect of the Amendment on benefits.

290.    Because Named Plaintiff Jerold Scherer was over the age of 55 when his benefit commenced and had over 25 years of service, he would have been eligible for the Fully Subsidized Early Retirement Benefit (*i.e.* under the terms of the Prior Plan Formula, if his benefit was paid after age 62, it would not have been reduced for payment prior to age 65).

291.    Because Named Plaintiff Jerold Scherer was over age 62 when his benefit commenced, and he was eligible for the Fully Subsidized Early Retirement Benefit, his benefit under the Prior Plan Formula would not have been reduced for payment prior to age 65.

292.    Because Named Plaintiff Jerold Scherer was over age 62 when his benefit commenced, and he was eligible for the Fully Subsidized Early Retirement Benefit, the Minimum Benefit would not be reduced for payment prior to age 65 (and the value would reflect that there was no reduction for payment prior to age 65).

293.    Named Plaintiff Jerold Scherer's annual benefit earned, as of December 31, 1998

(*i.e.* his Minimum Benefit) was $9,362.52 ($780.29 per month).

294.    Because Named Plaintiff Jerold Scherer was under age 45 on January 1, 1999, he was not eligible for a Transition Credit.

295.    Assuming that Named Plaintiff Jerold Scherer was eligible for the Fully Subsidized Early Retirement Benefit, he would have been entitled to a monthly benefit of $780.29, on September 1, 2021, due to the benefit earned prior to January 1, 1999.

296.    Assuming that named Plaintiff Jerold Scherer was entitled to a benefit of $780.29 commencing on September 1, 2021, due to the benefit already earned as of January 1, 1999, and assuming that named Plaintiff Jerold Scherer's total benefit earned as of August 2021 (when he terminated employment),  commencing on September 1, 2021 was $1,025.92, that would mean that he only earned an additional $245.63 (or less than one quarter of his total benefit) for his service after January 1, 1999 (or over half of his total service).

297.    Named Plaintiff Jerold Scherer's original Opening Account Balance on January 1, 1999 was $20,510.

298.    Named Plaintiff Jerold Scherer's total Cash Balance Account on September 1, 2021 was $212,717.

299.    Named Plaintiff Jerold Scherer's total Cash Balance Account of $212,717 was split with approximately $50,082 as attributable to the Opening Account Balance and $162,635 as attributable to post January 1, 1999 Pay Based Credits.

300.    Assuming Named Plaintiff Jerold Scherer's account attributable to post January 1, 1999 Pay Based Credits is $162,635, this would provide him a monthly benefit commencing on September 1, 2021 of $784.38.

301. Assuming that Named Plaintiff Jerold Scherer's benefit commencing September 1, 2021 attributable to the benefit already earned as of January 1, 1999 was $780.29 (from paragraph 293) and the benefit earned after January 1, 1999 commencing September 1, 2021 was $784.38, then his total benefit would have been $1,564.67.

302. Named Plaintiff Jerold Scherer received less than the sum of the benefit earned prior to January 1, 1999 and the benefit earned after January 1, 1999 as a direct result of the Opening Account Balance being less than the value of the benefit earned prior to January 1, 1999.

303. Had the Opening Account Balance had a value such that it provided the benefit it was communicated to provide the value of, *i.e.* the benefit earned on December 31, 1998, Named Plaintiff Jerold Scherer would have been provided with a higher benefit commencing on September 1, 2021.

304. Had Named Plaintiff Jerold Scherer's Opening Account Balance been sufficient to provide the value of the benefit already earned on December 31, 2021, then he would have received a benefit of $1,564.67 commencing on September 1, 2021, instead of $1,025.92, a difference of $538.75 a month (or $6,465.00 per year), payable each month from September 1, 2021 until his death.

305. Had the Amendment not occurred, and the provisions of the Prior Plan Formula continued, Named Plaintiff Jerold Scherer would have been entitled to a Plan benefit of approximately $3,475 a month ($41,700 a year) commencing on September 1, 2021.

306. If Named Plaintiff Jerold Scherer would have been entitled to a Plan benefit of $3,475 a month had the Amendment not occurred, and a benefit of $1,026 reflecting the Amendment, then he had a substantial reduction in his benefit due to the Amendment.

307.    Even if the 403(b) plan benefit (excluding employee deferrals with interest) were reflected in the comparison in the prior paragraph, Named Plaintiff Jerold Scherer still had a substantial reduction in his benefit due to the Amendment.

308.    Named Plaintiff Jerold Scherer had an average annual pay increase between 1999 and 2020 of 5.45% per year (as compared to the assumption used to determine the Transition Credit of 3.00%).

309.    The effective average Interest Crediting Rate (*i.e.* the Interest Crediting Rate that would produce the same Cash Balance Account) credited to Named Plaintiffs Jerold Scherer's Cash Balance Account was 3.68% (as compared to the assumption used to determine the Transition Credit of 6.00%).

310.    The Named Plaintiffs and Class Members similarly experienced a significant reduction in their expected future accruals as a result of the conversion, in addition to working for years without any additional retirement benefits.

*Misleading Plan Communications Regarding the 1999 Amendment*

311.    Beginning in or around 1998, Defendants issued communications to its employees that it knew contained materially false and misleading statements and omissions concerning the Amendment.

312.    For instance, Defendants prepared a letter dated December 16, 1998, addressed to employees in the NSUH Pension Plan, a group which also includes Class Members.

313.    This letter provided:

> We are pleased to announce that effective January 1, 1999 you will be a participant in our new Retirement Program, the details of which will be sent to your home shortly. The Health System will commence employer contributions to the new Retirement Program as of January 1, 1999. Concurrent with the new Program, we

are required to inform you that . . . the accruals under the North Shore University Hospital Pension Plan will stop as of January 1, 1999.

We are confident that as you learn about your new Retirement Program, you will feel as we do, that the Health System has accomplished one of our major goals, which is assisting you toward financial security in your retirement years.

314.    Here, this letter failed to set forth the Plan Amendment that would result in accruals under the NSUH Pension Plan stalled as of January 1, 1999.

315.    Moreover, the letter stating that the new "Retirement Program," which includes the Cash Balance Plan, will assist employees towards financial security in their retirement years is plainly misleading, where, as discussed in more detail above, Defendants knew that the conversion occurring under the new Retirement Program would result in employees' pension benefits experiencing periods of "wear-away," as well as a significant reduction in their benefit available at retirement. Such representations fell far short of those required of a fiduciary.

316.    As another example, Defendants also prepared and distributed a brochure, entitled "The Retirement Program," concerning a retirement program effective January 1, 1999.

317.    This brochure, at page 2, tells readers that the Retirement Program consists of two plans: The 403(b) Plan and The Cash Balance Plan, and that these plans will "help you build a solid foundation for your retirement income."

318.    This brochure, at page 9, also tells readers that "The Cash Balance Plan offers an innovative approach to pension plan design that: Offers the stability of a traditional pension plan[;] Allows you to know the value of your benefit at any given time[;] [and] Provides a benefit that grows over your career with the Health System."

319.    Again, such representations fell far short of those required of a fiduciary. Instead of disclosing the potential significant adverse ramifications the conversion would have on a

participant's benefit, Defendants emphasized an alleged growth in benefits that a participant would experience during their career. This emphasis is clearly misleading, as the Cash Balance Plan did not preserve the full value of each employee's Protected Benefit. None of the materials or examples provided to participants represent the effect of wear-away nor the lack of increase in the actual realized value of their available pension benefits. In fact, the new formula did not always provide "a benefit that grows over your career" as Joan illustrated. Finally, the change actually represented a reduction in the actual benefit a participant would receive for most plan participants, even if the benefits from the 403(b) were included, especially if the participant retired prior to age 65.

320. As yet another example of a misleading communication prepared by Defendants, Defendants prepared a letter dated January 6, 1999, addressed to NS-LIJHS employees, which provided further information regarding their new Retirement Program that became effective January 1, 1999, including enrollment information.

321. With respect to the Cash Balance Plan, participants were informed:

> You do not need to take any action to enroll. If you have an accrued benefit under the North Shore University Hospital Pension Plan and are an active participant in the Cash Balance Plan as of January 1, 1999, the value of your Pension Plan benefit as of December 31, 1998 will automatically become your opening balance in the Cash Balance Plan effective January 1, 1999. Your accrual of benefits under the Plan's current formula stops as of December 31, 1998. You will receive a statement showing your Cash Balance Plan opening balance following the close of the first quarter of 1999.

322. Here, informing employees, including Class Members, that "the value of your Pension Plan benefit as of December 31, 1998 will automatically become your opening balance in the Cash Balance Plan effective January 1, 1999," is plainly misleading where, as discussed in more detail above, Defendants knew that it was probable that a participant's Opening Account Balance

would provide a smaller benefit than the amount to which that participant would have been entitled to receive at normal or early retirement age had they earned no additional benefit after December 31, 1998.

323.    Defendants also prepared a letter dated December 1999 to Class Members, which enclosed the Summary Plan Description which "reflects detailed provisions of the Cash Balance."

324.    Under 29 U.S.C. § 1022, the SPD was required to be "written in a manner calculated to be understood by the average plan participant."

325.    The SPD's special provision affecting former participants of the North Shore University Hospital Pension Plan represents to Class Members how their "Opening Account Balance" was determined in the Cash Balance Plan.

> Your "Opening Account Balance" in the Cash Balance Plan is determined by converting your December 31, 1998 accrued benefit under the NSUH Pension Plan benefit formula to its present value on January 1, 1999. This conversion method assures that you receive a starting value in the Cash Balance Plan which is "actuarially equivalent" to the value of the benefit you had accrued under the NSUH Pension Plan's benefit formula assuming that you retire at age 65.

326.    The SPD also included an appendix referenced above, which provided examples through hypothetical individual, Joan. As discussed in more detail above, not only was it misleading to represent to participants that their Opening Account Balance in the Cash Balance Plan would be "actuarially equivalent" to the value they had previously accrued under the NSUH Pension Plan (because in reality the Opening Account Balances fell short of providing the full benefit to which a participant was already entitled), the SPD, including the appendix, was not written in a manner, nor does it provide sufficient information, that would allow an average Plan participant to understand why their Opening Account Balances fell short of providing the full benefit to which

- 59 -

they were already entitled.[7]

327.     As set forth above, the Defendants failed to comply with the regulatory notice requirements sufficient to inform the Named Plaintiffs and Class Members of facts sufficient to alert them to the violations of ERISA that would form a basis for their complaint.

328.     As set forth above, Defendants, by failing to comply with the regulatory notice requirements, did not provide the Named Plaintiffs and Class Members with sufficient information to alert them to the legal basis for any complaint.

329.     By assuring the Named Plaintiffs and Class Members that the Amendment was done in accordance with ERISA's rules and regulations, the Defendants induced the Named Plaintiffs and Class Members to believe that their rights were being protected.

330.     The Defendants conduct concealed the basis for the claims in this case.

331.     Given the facts set forth in this Complaint, and given that Defendants' communications made it appear no violation was occurring, and the difficulty for the Named Plaintiffs and Class Members to uncover the violation in their pension and benefits statement because those statements did not reveal the formulas for calculating those benefits at the detail needed to establish a violation, one would not expect that the Class Members exercising that diligence under the circumstances would be able to uncover the violations.

## CLASS ACTION ALLEGATIONS

332.     Named Plaintiffs' and Class Members' claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23 ("Rule 23").

---

[7]     Named Plaintiffs and the members of the proposed Class received initial Opening Account Balances in their Cash Balance Account based upon Defendants' determination of the purported "actuarial equivalent" lump sum value of their accrued benefits, as of January 1, 1999, under the Legacy Plans' prior formulas based upon the same method and assumptions as in the example in the SPD.

333.    The Rule 23 Class is defined as follows:

All persons who were participants in the Plan on January 1, 1999, and whose Cash Balance Account was credited with Pay Based Credit after January 1, 1999 pursuant to the Cash Balance Provisions of the Plan, and who were either paid a benefit from the Plan after January 1, 1999, or are still entitled to a benefit from the Plan; and the beneficiaries and estates of such persons and alternate payees under a Qualified Domestic Relations Order.

334.    The class action is maintainable under subsection (2) of Rule 23(b) because Plaintiffs seek and are entitled to relief, including, but not limited to, the reformation of the Plan to conform its terms to provide Named Plaintiffs and other Class Members with the benefits that they reasonably believed they were receiving under the Plan.

335.    That is, Defendants have acted and/or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive and other equitable relief in favor of the Class as a whole.

336.    The class action is also maintainable under subsections (1), (2), (3) and (4) of Rule 23(a).

337.    The Class is so numerous that joinder of all members is impracticable. The size of the Class is believed to be over 50.

338.    Common issues of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class Members. Among the common issues of law and fact are the following:

- Whether Defendants are fiduciaries of the Plan;
- Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;
- Whether Defendants violated ERISA's strict fiduciary standards (in violation of ERISA § 204(h), 29 U.S.C. § 1054(h)) by failing to provide a proper notice informing participants regarding how the plan benefits were determined with

sufficient detail for participants to understand the impact of the plan amendment, and how their benefits might have been reduced as a result of the plan amendment, and to the extent that a notice was provided that even remotely complied with the notice requirements of ERISA § 204(h), whether the notice was timely;

- Whether Defendants violated ERISA's strict fiduciary standards by preparing and disseminating participant communications with the intent to conceal the wear-away and/or that had the effect of concealing wear-away;

- Whether Defendants violated ERISA's strict fiduciary standards (in violation of ERISA § 105(a), 29 U.S.C. § 1025(a)) by preparing and disseminating participant benefit statements that misstated the participants' benefits, and furthered the intent to conceal that the participants benefits were in wear-away;

- Whether Defendants violated ERISA's strict fiduciary standards (in violation of ERISA § 102, 29 U.S.C. § 1022) with the intent to conceal and/or that had the effect of concealing the reductions in benefits provided by the Plan both at normal and early retirement; and

- Whether, as a result of the intentional and/or reckless misrepresentations and omissions made by Defendants in Plan documents and other Plan communications, Class Members were ignorant of the truth about their retirement benefits.

339.    These common questions of law and fact also predominate over any questions affecting only individual Class Members.

340.    The Named Plaintiffs' claims are typical of the claims of other members of the Class because Named Plaintiffs, like other Class Members, were participants in the Plan on January 1, 1999, their Cash Balance Accounts were credited with Pay Based Credits after January 1, 1999 pursuant to the Cash Balance Provisions of the Plan and were either paid a benefit from the Plan after January 1, 1999, or are still entitled to a benefit from the Plan; and have suffered injuries due to Defendants' imprudence. Defendants treated Named Plaintiffs the same as members of the Class with respect to the Plan.

341.    Named Plaintiffs and their counsel will fairly and adequately protect the interests of the Class. Named Plaintiffs have no interest antagonistic to the Class and have retained counsel experienced in complex class action litigation.

342.    Class counsel, Thomas & Solomon PLLC, is qualified and able to litigate Named Plaintiffs' and Class Members' claims.

343.    Thomas & Solomon PLLC concentrates its practice in employment litigation, and its attorneys are experienced in class action litigation.

344.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy and avoids duplication by allowing these claims to be prosecuted in a single action. Named Plaintiffs and Class Members lack the resources to adequately prosecute separate claims.

345.    Moreover, the class action is maintainable under subsection (3) of Rule 23(b) because the Named Plaintiffs and Class Members seek to resolve common questions of law and fact that predominate among the Named Plaintiffs and Class Members and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

346.    The Class is also maintainable under Rule 23(c)(4) because resolution of the common issues will significantly advance the litigation or entitle Plaintiffs to injunctive relief.

## FIRST CAUSE OF ACTION

### *Violation of 29 U.S.C. § 1054(h) Through Failure to Provide Adequate Notice*

347.    Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent causes of action as if fully restated herein.

348.    In 1999, 29 U.S.C. § 1054(h) provided that:

A plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to . . .each participant in the plan . . .

349.    Regulation 26 C.F.R. § 1.411(d)-6, Q&A-10 allows:

Q–10: Does a notice fail to comply with section 204(h) if it contains a summary of the amendment and the effective date, without the text of the amendment itself?

A–10: No, the notice does not fail to comply with section 204(h) merely because the notice contains a summary of the amendment, rather than the text of the amendment, if the summary is written in a manner calculated to be understood by the average plan participant and contains the effective date. The summary need not explain how the individual benefit of each participant or alternate payee will be affected by the amendment.

350.    To the extent that Defendants attempted to comply with 204(h), they did so through the option available in Regulation 26 C.F.R. § 1.411(d)-6, Q&A-10.

351.    When regulation 26 C.F.R. § 1.411(d)-6, Q&A-10 refers to the summary not needing to explain how the individual benefit of "each participant" will be affected, what it is referring to is that the communication need not be personalized to each participant, showing how that individual participant is impacted by the Amendment.

352.    Under the law, an amendment to a defined benefit plan significantly reduces the rate of future benefit accrual if it is reasonably expected to reduce the amount of the future annual benefit commencing at normal retirement age. *See* 26 C.F.R. § 1.411(d)-6, Q&A-5(a)(1). This determination is made by comparing the "amount of the annual benefit commencing at normal retirement age as determined under Q&A-5(a)(1) under the terms of the plan as amended, with the amount of the annual benefit commencing at normal retirement age as determined under Q&A-5(a)(1) under the terms of the plan prior to amendment." *See* 26 C.F.R. § 1.411(d)-6, Q&A-7.

353.    It is clear from the language in both the law and the regulation that when determining if benefits are being reduced, only benefits in the Plan at issue are viewed, *i.e.* when determining if benefits under the Plan here were reduced, the determination is made without

- 64 -

regard to whether benefits in some other plan, such as the 403(b) plan were increased in such a way that the sum of the two would prevent a reduction in the combined benefits. (see, in particular 26 C.F.R. § 1.411(d)-6, Q&A-7 saying "For a defined benefit plan this is done by comparing the amount of the annual benefit commencing at normal retirement age as determined under Q&A–5(a)(1) under **the terms of the plan as amended**, with the amount of the annual benefit commencing at normal retirement age as determined under Q&A–5(a)(1) under **the terms of the plan prior to amendment**." (emphasis added)).

354.   The Amendment provided for a significant reduction in the rate of Named Plaintiffs' and proposed Class Members' future benefit accruals within the meaning of 29 U.S.C. § 1054(h).

355.   The reduction in the rate of future benefit accrual was illustrated above for Joan both assuming that current factors remained constant and assuming potential changes in factors, such as future salary increases as well as for Named Plaintiff Jerold Scherer based upon the actual events that occurred.

356.   As discussed above, the fact that the employee communications suggest that there was no reduction in the benefit at age 65, if the benefit under the Plan are combined with the benefits from the 403(b) plan is a tacit admission that the benefit in this Plan were reduced by the Amendment to the Plan.

357.   Notwithstanding the law's requirements, Named Plaintiffs have no records of, nor any recollection that that the Defendants provided the Named Plaintiffs or members of the proposed Class with the required written notice which set forth the text of the Amendment which created the newly adopted Cash Balance Plan provisions.

358.    Nor did the Defendants fairly or sufficiently summarize the Amendment in a manner calculated to be understood by the average Plan participant, which necessarily would have to include disclosure of the significant reduction in the rate of future benefit accruals, or, in the alternative, sufficient information that a participant could determine their benefit after the Amendment with sufficient detail so as to enable the participant to compare the benefit under the amended Plan to what the benefit would have been had the Plan not been amended.

359.    Any written notice that was provided to Named Plaintiffs or members of the proposed Class did not put participants on notice of the potential reduction in the rate of future benefit accruals, which is the purpose of a 204(h) notice.

360.    In fact, to the contrary, the clear indication of the communications was that the Amendment was an improvement to the Plan, or at a minimum, provided the same level of benefit, rather than a reduction in benefits.

361.    Any written notice that was provided contained false or misleading material misstatements or omissions that concealed that the Amendment provided for a significant reduction in the rate of future benefit accrual or concealed the extent to which it did so.

362.    Defendants' failure to notify Named Plaintiffs and other Plan participants of a significant reduction in the rate and/or a freeze of future benefit accruals in conformance with statutory requirements 15 days prior to the January 1, 1999, effective date of the Amendment violated the 29 U.S.C. § 1054(h), prohibition on such Plan amendments in the absence of such notice.

363.    Accordingly, pursuant to 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed Class seek and are entitled to relief, including nullification of the Amendment, together

with all other appropriate equitable and make-whole relief.

## SECOND CAUSE OF ACTION

### *Violation of 29 U.S.C. § 1054(h) through failure of notice to be timely*

364.   Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent causes of action as if fully restated herein.

365.   In 1999, 29 U.S.C. § 1054(h) provided that:

A plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to . . .each participant in the plan . . .

366.   Since the Amendment was effective January 1, 1999, notice was required to be provided to Plan participants by mid-December 1998.

367.   No adequate notice was provided prior to the effective date.

368.   Defendants' failure to notify Named Plaintiffs and other Plan participants of a significant reduction in the rate and/or a freeze of future benefit accruals in conformance with statutory requirements 15 days prior to the January 1, 1999, effective date of the Amendment violated the 29 U.S.C. § 1054(h), prohibition on such Plan amendments in the absence of such notice being timely.

369.   Accordingly, pursuant to 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed Class seek and are entitled to relief, including nullification of the Amendment or delay of the effective date until 15 days after proper notice was provided, together with all other appropriate equitable and make-whole relief.

## THIRD CAUSE OF ACTION

### *Violation of 29 U.S.C. § 1022 Through Failure to Disclose Wear-Away*

- 67 -

370.    Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent cause of action as if fully restated herein.

371.    Throughout the relevant time, 29 U.S.C. § 1022 has required that participants be furnished with a SPD that is "written in a manner calculated to be understood by the average plan participant," is "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan," and includes the plan's eligibility requirements, as well as the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(a)-(b); *see also* 29 C.F.R. § 2520.102-3(1).

372.    Defendants' failure to explain the full import of the Amendment in a SPD distributed to Plan participants, including but not limited to a complete explanation that the crediting of Pay Based Credits and Transition Credits to a Plan participant's Cash Balance Account did not represent any actual increase in the Plan participant's benefit under the Plan (and therefore had no value) for the period of time that the Plan participant was in wear-away, violated and violates the minimum requirements for SPDs set forth in 29 U.S.C. § 1022 and its corresponding regulations set forth under 29 C.F.R. § 2520.102.

373.    In connection with the Amendment, Defendants also failed to provide a Summary of Material Modifications to the plan participants as required by 29 C.F.R. § 2520.104b-3.

374.    In the event communications prior to the Date of Conversion are considered SPDs, and subsequent to the Date of Conversion, Defendants have issued SPDs that were not and are not "written in a manner calculated to be understood by the average plan participant," were not and are not "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights," under the Plan, and did and do not disclose the existence or

extent of the wear-away effect.  29 U.S.C. § 1022(a)-(b); *see also* 29 C.F.R. § 2520.102-3(1).

375.     Since the prior benefit was only disclosed in terms of the benefit payable as the annual annuity benefit payable at age 65 (or the reduced annual annuity benefit payable at early retirement ages), there is no way, from the communications, for a participant to determine the benefit under the Cash Balance Formula in the same terms as the Minimum Benefit, to determine if the Plan participant was impacted by the Minimum Benefit.  That means that there was no way for an average Plan participant to determine if, and to what extent the participant was impacted by wear-away.

376.      In fact, by equating the benefit under the Plan to the Cash Balance Account, and growth in the Cash Balance Account to growth in the benefit, the communications overtly hid that wear-away could even exist, *i.e.* that the Cash Balance Account could be growing while the benefit accrual was stalled at the December 31, 1998 already earned benefit.

377.     The SPDs contain and contained materially false and misleading statements and omissions regarding Named Plaintiffs' and the proposed Class Members' benefit accruals and rate of benefit accruals under the amended Plan, which were intentionally designed to mislead participants about and/or conceal the existence and extent of the wear-away effect and to prevent Plan participants from discovering that Defendants had failed to disclose and had misled them about the existence of wear-away.

378.     Defendants converted Named Plaintiffs' and Class Members' accrued benefit prior to January 1, 1999, to an Opening Account Balance pursuant to the Cash Balance Plan provisions and did so using a conversion method that froze a participant's pension accruals until such time that the participant was no longer in a period of "wear-away."

- 69 -

379.    Therefore, Defendants knew, or should have known, that the rate of benefit accruals under the Plan would be zero for some period of time (*i.e.* the wear-away period, during which the Cash Balance Account was less than the value of the Protected Benefit).

380.    In other words, Defendants knew something that the participants did not: Pay Based Credits and Transition Credits would have no value to Plan participants (*i.e.* were not increasing the Plan benefit) for some period of time.

381.    Despite Defendants' actions, they deliberately described the conversion in a manner that would lead participants to mistakenly, but reasonably, believe that they would not only retain the full value of their previously accrued benefits, including early retirement benefits, but that they would immediately be earning new additional benefits under the Plan at a rate that would result in an ultimate benefit that was not significantly lower than they would have earned under the Prior Plan Formula.

382.    Defendants should have had little to no doubt that every participant that accrued Pay Based Credits after January 1, 1999 pursuant to the Cash Balance Formula, would earn no additional retirement benefits under the Plan for some period of time following the effective date of the 1999 Amendment – *i.e.*, that every Plan participant who is a member of the proposed Class would experience a period of wear-away following the effective date of the cash balance conversion. Named Plaintiffs and every member of the proposed Class did in fact experience a period of wear-away following the Date of Conversion.

383.    Defendants intentionally undertook to conceal these facts from Named Plaintiffs and the members of the proposed Class via omissions and/or misleading communications.

384.    Defendants' false and misleading statements and omissions regarding wear-away

and protected benefit accruals were and are self-concealing and were (and continue to be) part of Defendants' attempt to fraudulently conceal the underlying ERISA violations alleged here.

385.    As Joan illustrates, after credits for the first quarter, her account balance would be $45,295.82, but her 417(e) minimum required lump sum as of March 31, 1999 would be the protected age 65 annual benefit already accrued as of December 31, 1998 of $12,144 times the age 65 conversion factor of 11.39269 (determined at the 1999 interest rate of 5.15%) discounted at the 1999 interest rate of 5.15% for the 16.75 years for March 31, 1999 until Joan's 65th birthday, would be $12,144 X 11.39269 / 1.0515 ^ 16.75 = $59,659.90.  Even if the plan could have further discounted for the probability of survival from age 48 until age 65 (*i.e.* ignoring the small increase in survival from age 48.25 rather than from age 48.00) and using the factor used to create the Opening Account Balance of 0.91467, the minimum lump sum required for Joan would be $59,659.90 X 0.91467 or $54,569.22, $9,273.40 more than the benefit equal to her $45,295.82 Cash Balance Account that would have been communicated to her.  In other words, when, in 1999 she would have been told that the value of her benefit was $45,295.82 (because that was her Cash Balance Account), that would have been false (because the value of her benefit was, at worst, $54,569.22, and more appropriately $59,659.90) and misleading (because it illustrated that her Pay Based Credits were increasing her benefit, when in fact, until she received roughly $10,000 worth of Pay Based Credits, interest adjusted (which would take years) the Pay Based Credits provided no increase in her benefit at all).

386.    Even if the minimum lump sum for Joan is $54,569.22, but her Cash Balance Account is $45,295.82, that means her account balance is only 83% of her protected minimum lump sum.

387.    This further means that Joan received no increase in her benefit due to the $825 pay credit she received in the first quarter of 1999, because her benefit would be the higher value of her Minimum Benefit.

388.    Assuming that the plan is prohibited from using mortality prior to age 65 when determining the minimum lump sum, then, while the cash balance account would grow each year with both Pay Based Credits and Interest Credits, the protected minimum lump sum value would only grow with interest at 5.15%.  Assuming constant future salary, and that the interest rate remained constant, Joan's Cash Balance Account would exceed her protected minimum lump sum in roughly June 2004, when her protected minimum lump sum value, based upon the December 31, 1998, accrued benefit of $12,144 would be $77,657.11 and her Cash Balance Account (after the Pay Based Credit for June 2004) would be $78,659.20.

389.    The analysis in the prior paragraph paints a better picture of the Cash Balance Formula than actually would apply because it includes the 2.50% Transition Credit, and reflecting the Joan's 1999 compensation jumps 46% from $41,000 in 1998 to $60,000 in 1999.

390.    A more accurate comparison would have no Transition Credit (since, as explained above, Joan was not eligible for a Transition Credit) and compensation staying at the $41,000 level.

391.    If Joan has no Transition Credit, and her compensation remains level at $41,000, then her Cash Balance Formula benefit would never overtake the value of the Protected Benefit prior to age 65.

392.    At any point at which Joan's Cash Balance Account is less than the protected minimum lump sum value, she has received no growth in her benefit from the Plan after the conversion, and no value from the Pay Based Credits.

393.    When the mortality tables are updated to reflect longer life expectancies (as they were prior to 2004, and then again annually starting in 2008) it increases the protected minimum lump sum value, thus extending the point at which the Cash Balance Account exceeds the protected minimum lump sum value.

394.    When interest rates decline, as they did, it increases the protected minimum lump sum value, thus extending the point at which the Cash Balance Account exceeds the protected minimum lump sum value, as well as decreasing the rate at which the Cash Balance Account grows (because of the lower Interest Credits) which also extends the point at which the Cash Balance Account exceeds the protected minimum lump sum value.

395.    If the applicable interest rates in 2015 (when Joan turns age 65) are 1.24% for payments made in the first 5 years, 3.86% for payment made in the next 15 years and 4.96 for payments made in over 20 years (the 417(e) minimum lump sum factors based upon the August 2014 rates), then using the applicable mortality table in effect in 2015, the age 65 conversion factor would be roughly 13.42, which would make the minimum protected lump sum $12,144 X 13.42 or $162,972.48.  Assuming that Joan's salary in 1999 is her 1998 salary, increased by 5%, and that it increases 5% each January 1st thereafter, Joan's cash balance account balance, based upon the actual history of interest rates and no Transition Credit would be roughly $137,960.  If Joan's cash balance account was $137,960, that would mean that all of the pay credits for the 17 years from January 1, 1999 through December 31, 2015 provided no benefit increase over the Protected Benefit, even though the average Pay Based Credit, with interest from when the pay credit was posted until December 31, 2015 would be roughly $2,650 a year.  In other words, the decreasing interest rate would keep extending Joan's wear-away such that she never exits wear-away, prior to

age 65.

396.     That means that when Defendants were telling a participant like Joan that her benefit was growing, each year, by the amount of the Pay Based Credits that was simply false.

397.     These examples of the false and misleading statements and omissions made by Defendants were not isolated incidents, but part of a pattern of fraud and fraudulent concealment found in most if not all of Defendants' communications with participants about the Cash Balance Formula, designed in part to avoid incurring the liability that may result if one or more of the claims made here are successful.

398.     Accordingly, pursuant to 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed Class seek and are entitled to relief, including, but not limited to, reformation of the Plan to conform its terms to provide Named Plaintiffs and other Class Members with the benefits that they reasonably believed they were receiving under the Plan, to wit, that the accrued benefit under the Cash Balance Formula is not less than the sum of the value of the Protected Benefit plus the value of the Pay Based Credits and Transition Credits, increased with Interest Credits, together with all other appropriate equitable and make-whole relief including surcharge of the Plan fiduciaries and disgorgement of any unjust enrichment by the Defendants.

## **FOURTH CAUSE OF ACTION**

### *Violation of 29 U.S.C. § 1025(a)(1)(B) Through Failing to Reflect the Value of the Minimum Benefit on the Quarterly Benefit Statements*

399.     Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent cause of action as if fully restated herein.

400.     29 U.S.C. § 1025(a) requires a pension benefit administrator to provide periodic pension benefit statements that are individualized for each plan participant.   Among other

information, the "pension benefit statement . . . shall indicate, on the basis of the latest available information . . . the total benefits accrued." 29 U.S.C. § 1025(a)(2)(A)(i)(I).

401. Defendants' provided Class Members with quarterly Cash Balance Account statements, but the statement contained only the Cash Balance Account and that violated 29 U.S.C. § 1025(a) because Cash Balance Account was not the benefit the Class Member was entitled to receive.

402. The benefit that the Class Member was entitled to receive was the greater of the value of the Protected Benefit or the Cash Balance Account, thus, the quarterly statements consistently failed to provide Class Members with their "total benefits accrued," in violation of 29 U.S.C. § 1025(a).

403. The quarterly statements made no reference to the Minimum Benefit (*i.e.* the value of the Protected Benefit), such as "but not less than the Minimum Benefit."

404. Because Class Members received documents titled "Account Statement" that, by including a steadily growing Cash Balance Account, led the Class Members to incorrectly believe that their Plan benefits were growing, when they were not.

405. The quarterly account statements provided to Class Member were required to contain their "total benefits accrued" and yet they did not, in violation of the requirements of 29 U.S.C. § 1025(a).

406. The failure of the quarterly account statements to reflect the Minimum Benefit was part of the effort on the part of Defendants to obscure and mislead Plan participants regarding the effects of the Amendment, including that Plan participants in wear-away were not actually earning any Plan benefits.

407.     Accordingly, Named Plaintiffs and the proposed Class seek and are entitled to relief, including, but not limited to, reformation of the Plan to conform its terms to provide Named Plaintiffs and other Class Members with the benefits that they reasonably believed they were receiving under the Plan, to wit, that the accrued benefit under the Cash Balance Formula is not less than the sum of the value of the Protected Benefit plus the value of the Pay Based Credits and Transition Credits, increased with Interest Credits, together with all other appropriate equitable and make-whole relief including surcharge of the Plan fiduciaries and disgorgement of any unjust enrichment by the Defendants.

## FIFTH CAUSE OF ACTION

### *Violation of 29 U.S.C. § 1022 Through False and Misleading Disclosure Regarding the Impact of the Amendment on the Ultimate Benefit Payable From the Plan*

408.     Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent cause of action as if fully restated herein.

409.     Throughout the relevant time, 29 U.S.C. § 1022 has required that participants be furnished with a SPD that is "written in a manner calculated to be understood by the average plan participant," is "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan," and includes the plan's eligibility requirements, as well as the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(a)-(b); *see also* 29 C.F.R. § 2520.102-3(1).

410.     Defendants' claim that "Transition Credits are designed to provide additional benefit to certain participants who might otherwise experience a shortfall in their normal retirement benefits as compared with those benefits, they would have received under the former NSUH Pension Plan, had it continued," would lead the average Plan participant to the following

conclusions:

1)  The risk of there being a shortfall was small.

2)  If there was a shortfall, it would not be substantial.

3)  If the participant was not eligible for a Transition Credit, it was because the risk of a shortfall was small even without a Transition Credit.

4)  If the participant was not eligible for a Transition Credit, if there was a shortfall, it would not be substantial.

5)  The risk of their being a shortfall was not significantly impacted by the age the participant chose to commence their benefit.

6)  The risk of there being a shortfall was not significantly impacted by their election to defer (or not to defer) in the 403(b) plan.

7)  When combined with other comments, such as in the December 16, 1998 letter, when it says that the Amendment "accomplished on of our major goals, which is assisting you toward financial security in your retirement years," that the Amendment did not add significant risk to the financial security of the retirement benefits.

411.    All of the conclusions listed in the prior paragraph, that the discussion of the Transition Credit in the SPD would lead the average Plan participant to conclude, are wrong.

412.    By failing to provide more detail regarding the impact of risks that the post Amendment benefit would be less than the benefit under the Plan, had the Plan not been amended, the SPD hid the risks that benefits would be reduced, even with the Transition Credit.

413.    The SPDs contain, and contained, materially false and misleading statements and omissions regarding Named Plaintiffs' and the proposed Class Members' benefit accruals and rate of benefit accruals under the amended Plan, which were intentionally designed to mislead participants about and/or conceal the significant reduction in benefits that could occur, for example, if interest rates continued to decline (as they did).

414.    Defendants should have had little to no doubt that every participant that

received Pay Based Credits after January 1, 1999, pursuant to the Cash Balance Formula would have a lower benefit under the Cash Balance Formula than under the Prior Plan Formula.  In other words, Defendants should have had little to no doubt that every participant's ultimate benefit paid by the Plan was reduced due to the Amendment.

415.   Defendants intentionally undertook to conceal these facts from Named Plaintiffs and the members of the proposed Class via omissions and/or misleading communications.

416.   Defendants' false and misleading statements and omissions regarding the reductions in the ultimate benefit payable by the Plan were and are self-concealing and were (and continue to be) part of Defendants' attempt to fraudulently conceal the underlying ERISA violations alleged here.

417.   As Joan and Named Plaintiff Jerold Scherer illustrated above, reductions in the benefits, as a result of the Amendment, were the expected norm, not the exception, particularly for participants electing to receive their benefit prior to age 65, when eligible for the Fully Subsidized Early Retirement Benefit.

418.   Accordingly, pursuant to 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed Class seek and are entitled to relief, including, but not limited to, reformation of the Plan to conform its terms to provide Named Plaintiffs and other Class Members with the benefits that they reasonably believed they were receiving under the Plan, to wit, a benefit not less than the benefit determined under the Prior Plan Formula, together with all other appropriate equitable and make-whole relief including surcharge of the Plan fiduciaries and disgorgement of any unjust enrichment by the Defendants.

## SIXTH CAUSE OF ACTION

### *Violation of 29 U.S.C. § 1022 Through False and Misleading Disclosure Regarding the Impact of the Amendment on the Ultimate Benefit Payable, when Combined with the 403(b) Plan*

419.   Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs and subsequent cause of action as if fully restated herein.

420.   In the alternative to the Fifth Cause of Action, should the court determine that the SPD sufficiently discloses that the "shortfall" was not between 1) the benefit under the Cash Balance Formula and 2) the Prior Plan Formula, but rather between 1) the sum of the benefit under the Cash Balance Formula and the benefit under the 403(b) plan (excluding the portion of the benefit under the 403(b) plan attributable to employee deferrals with interest) and 2) the benefit under the Prior Plan Formula, then the requested relief under the Fifth Casuse of Action should be appropriately adjusted.

421.   Accordingly, pursuant to 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed Class seek and are entitled to relief, including, but not limited to, reformation of the Plan to conform its terms to provide Named Plaintiffs and other Class Members with the benefits that they reasonably believed they were receiving under the Plan, to wit, a benefit not less than the benefit determined under the Prior Plan Formula, reduced by the benefit payable from the 403(b) plan (excluding employee deferrals and interest on the employee deferrals), together with all other appropriate equitable and make-whole relief including surcharge of the Plan fiduciaries and disgorgement of any unjust enrichment by the Defendants.

## SEVENTH CAUSE OF ACTION

### *Violation of 29 U.S.C. § 1104(a)*

422.   Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs

and subsequent causes of action as if fully restated herein.

423.    Defendants breached their strict fiduciary duties under 29 U.S.C. § 1104(a) by intentionally, recklessly or negligently making the materially false and misleading statements and omissions described above, both before and after the adoption of the 1999 Amendment; by intentionally, recklessly or negligently violating 29 U.S.C. §§ 1002, 1054(h), and 1104(a); and by fraudulently concealing or attempting to fraudulently conceal those violations and the violations of 29 U.S.C. § 1054(b)(1)(H), as described above.

424.    ERISA imposes fiduciary duties of loyalty, care, and prudence upon Defendants as fiduciaries to the Plan. These fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

425.    Under 29 U.S.C. § 1104(a)(1), a fiduciary (when acting in a fiduciary capacity) is not permitted to balance the interests of plan participants and the plan's sponsor: the focus on participants must be "exclusive."

426.    Both before and following the purported effective date of the Amendment, the Defendants intentionally and/or recklessly made and continued making materially false and misleading statements and omissions designed to (and/or that did in fact) conceal the Plan's wear-away effect; and designed to (and/or that did in fact) prevent Plan participants from discovering that Defendants had failed to disclose and had misled them about the existence of wear-away and about how the rate of benefit accrual under the Plan was significantly less than under the Legacy Plan(s).

427.    Any communication provided was intended to, and did, lead an average participant to think that their "benefit" under the Plan was properly preserved under the new Plan

amended and restated as of January 1, 1999; that he/she could monitor the increase in their benefit entitlement simply by watching the account grow; and that the account – and therefore their benefit – would indeed grow each year by the amount of the "yearly contribution" Defendants would make to the account. But all of this was false: a Plan participant's already accrued benefit was not adequately reflected in a participant's Opening Account Balance and the growth in the account balance would not necessarily represent an increase in the participant's benefit entitlement because the account balance had no new "value" unless and until employees worked long enough to wear-away the value of their benefit already accrued under the Plan prior to January 1, 1999. Defendants knew all of this, and accordingly knew that their representations were false and misleading.

428.    The intentional and/or reckless misrepresentations and omissions made by Defendants in Plan documents and other Plan communications, constitute a breach of fiduciary duty under 29 U.S.C. § 1104(a).

429.    Further, Named Plaintiffs and the members of the proposed Class were harmed by Defendants' violations of law and the false or misleading statements and omissions referenced above.

430.    Defendants' failure to provide notice of the significant reduction in the future rate of benefit accrual in accordance with the requirements of 29 U.S.C. § 1054(h), failure to provide adequate and non-misleading SPDs in accordance with the requirements of 29 U.S.C. § 1022, and corresponding breaches of fiduciary duty for those failures, harmed Named Plaintiffs and other members of the proposed Class, including by depriving them of the right to the information required by 29 U.S.C. §§ 1002, 1054(h), and 1104(a), and the opportunity to contest or react to

those changes with that information; by depriving them of the opportunity to benefit from action employees may have taken as a group to contest or protest the changes (*e.g.*, by demanding higher benefits and/or obtaining timely union representation); and by depriving them of the greater benefits (and/or less significant reductions) that may have resulted had the Defendants fully and honestly disclosed the entirety of the effects of the Amendment, among other things.

431. Accordingly, pursuant to 29 U.S.C. §§ 1109(a), 1132(a), Named Plaintiffs and the proposed Class seek and are entitled to relief, including nullification of the Amendment, reformation of the Amendment and/or the Plan to conform the terms to provide Named Plaintiffs and other Class Members with the benefits that they reasonably believed they were receiving under the Plan, to wit, that the accrued benefit under the new Cash Balance Provisions of the Plan would include and protect all previously accrued benefits under the Legacy Plan, including early retirement benefits, and that benefits under the Cash Balance Plan provisions would begin accruing immediately and would do so at rates such that the ultimate benefits would be comparable to those under the Legacy Plans, together with all other appropriate equitable and make-whole relief including surcharge of the Plan fiduciaries and disgorgement of any unjust enrichment by the Defendants.

**WHEREFORE**, Named Plaintiffs pray that Judgment be entered against Defendants and that the Court award the following relief:

a. a declaration that Defendants have breached their fiduciary duties under ERISA;

b. an order certifying the Class as requested and designating Thomas & Solomon PLLC as Class Counsel;

c. designation of William Lorusso, Margaret Gurlides, Linda Moriarty, Richard Seaberg, Gary Leonard, Carol Vorperian, Nicholas Campagnola, Jerold Scherer, Denise Bevilacqua, and Karen Cervantes as Class

- 82 -

Representatives;

d.   judgment for Named Plaintiffs and the Class against Defendants on all claims expressly asserted and/or within the ambit of this Complaint;

e.   an order enjoining the Plan Administrator from continuing to violate the law and/or the terms of the Plan including such terms of the Plan as are implied by law in the manners alleged or referenced in this Complaint or shown by the facts;

f.   an order granting Named Plaintiffs and the Class full equitable relief as authorized by law, including but not limited to, surcharge, unjust enrichment, disgorgement and reformation in all cases effective as of the date the alleged violations first occurred and taking into account all accrued benefits;

g.   following entry of predicate relief and/or reformation of the Plan that conforms its terms to the requirements of the law, a further order requiring Defendants to recalculate the benefit amounts due or past due under the terms of the Plan in accordance with the requirements of ERISA, and, where applicable, for the Plan to pay the difference, plus interest, to or on behalf of all Class Members who received less in benefits or benefit accruals than the amount to which they are entitled and/or to pay benefits to which Class Members are entitled in all applicable optional forms;

h.   an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Named Plaintiffs' and Class Members' rights;

i.   an order awarding pre- and post-judgment interest;

j.   service payments for the Named Plaintiffs; and

k.   an order awarding, declaring or otherwise providing Named Plaintiffs and the Class all other such relief under 29 U.S.C. § 1132(a), or any other applicable law, that Named Plaintiffs may subsequently specify and/or that the Court may deem appropriate.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims in this Amended Class Action Complaint so triable.

Dated: October 11, 2024

**THOMAS & SOLOMON PLLC**

By:   /s/ J. Nelson Thomas
　　　J. Nelson Thomas, Esq.
　　　Jessica L. Lukasiewicz, Esq.
　　　*Attorneys for Plaintiffs and Class Members*
　　　693 East Avenue
　　　Rochester, New York 14607
　　　Telephone: (585) 272-0540
　　　nthomas@theemploymentattorneys.com
　　　jlukasiewicz@theemploymentattorneys.com